# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KAREN DUNBAR,

     *Plaintiff*,

v.

OMNICOM GROUP, INC., OMNICOM
MANAGEMENT SERVICES, DDB
WORLDWIDE COMMUNICATIONS,
TLP, INC. d/b/a TRACYLOCKE,
TERESA BRAMMER,

     *Defendants.*

No. 3:19-cv-00956 (KAD)

February 18, 2021

## MEMORANDUM OF DECISION RE:
## DEFENDANTS' MOTION TO DISMISS (ECF NO. 86) AND
## MOTION FOR ENTRY OF JUDGMENT ON THE PLEADINGS (ECF NO. 89)

Kari A. Dooley, United States District Judge:

This action arises out of the termination of Plaintiff Karen Dunbar's ("Dunbar" or the "Plaintiff") employment on March 27, 2018. Pending before the Court is Defendants' motion to dismiss all claims against Defendants DDB Worldwide Communications ("DDB"), Omnicom Management Services ("OMS"), and Teresa Brammer ("Brammer"), as well as Plaintiff's libel claim against all Defendants—DDB, OMS, TLP, Inc. d/b/a TracyLocke ("TracyLocke"), Omnicom Group, Inc. ("Omnicom") and Brammer. (ECF No. 86.) Also pending is Defendants' motion for judgment on the pleadings with respect to Plaintiff's claims against Omnicom brought pursuant to the Equal Pay Act. (ECF No. 89.) Dunbar has filed oppositions to both motions and the Defendants have filed reply briefs in support of their requested relief. For the reasons that follow Defendants' motion to dismiss is GRANTED in part and DENIED in part. The motion for judgment on the pleadings is GRANTED without prejudice to the filing of an amended complaint.

1

**Allegations**

The following allegations are taken from the Plaintiff's First Amended Complaint (the "FAC," ECF No. 64) and are accepted as true for purposes of the instant motions. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

Dunbar is an accomplished advertising writer and creative director whose nearly 30-year career has included working in the industry's most prestigious advertising agencies and advising many high-profile clients. (FAC ¶¶ 1, 30.) From May 2015 through March 27, 2018, Dunbar served as an employee of Omnicom, DDB, and TracyLocke (which, together with OMS, she refers to as the "Agency") at TracyLocke's Wilton, Connecticut office. (*Id*. ¶ 15.) Omnicom is a global marketing and corporate communications company with approximately 78,000 employees worldwide; it exercises extensive control over the operations and personnel decisions of OMS, DDB, and TracyLocke, each of which is an Omnicom wholly-owned subsidiary. (*Id*. ¶¶ 16–19.) OMS is located in Dallas, Texas and at all relevant times performed human resources ("HR") and information technology ("IT) functions for agencies that operate under the Omnicom umbrella. (*Id*. ¶ 17.) DDB is headquartered and incorporated in New York and at all relevant times exercised extensive control over TracyLocke's personnel decisions and operations. (*Id*. ¶ 18.) TracyLocke employs more than 650 professionals in thirteen offices, including its Connecticut office where Dunbar worked. (*Id*. ¶ 19.) Brammer resides in Texas and at all relevant times served as Omnicom's Chief Human Resources Director. (*Id*. ¶ 20.)

Dunbar began her career with the Agency in May 2015 as a freelance copywriter and creative director, which meant that she was not entitled to important benefits, including health and retirement benefits, that accrued to male employees performing comparable work. (*Id*. ¶ 31.) Despite working long hours and producing exemplary work, Dunbar's requests for full-time

employment and attendant benefits were denied until April 2016, when she was offered a position as Associate Creative Director for TracyLocke's Hewlett Packard ("HP") client account. (*Id.* ¶¶ 31–33.) Though overqualified for the position, Dunbar was encouraged to accept in order to achieve employee status and a few months later was promoted to Creative Director of the HP team. (*Id.* ¶ 33.)

Although it is TracyLocke's second largest office in the United States, the Agency's Connecticut office lacks a Human Resources department or even a single HR representative. (*Id.* ¶ 43.) This absence has contributed to a "Mad Men" culture in which male supervisors and employees perpetuate unchecked sexual harassment, discrimination, and abusive behavior toward female subordinates. (*Id.* ¶ 44.) The Agency's reputation for gender inequity in an industry already afflicted by gender discrimination is well-known and is reflected in, *inter alia*, comments from TracyLocke CEO Hugh Boyle ("Boyle") describing his creative team as "a Band of Brothers," a significant gender pay gap, disproportionate numbers of men in high-level positions, public employee reviews recounting sexual harassment and discrimination, and the Agency's disregard for serious complaints of harassment and abuse. (*Id.* ¶¶ 46–50.)

Throughout her tenure with the Agency, Dunbar herself "was subjected to a severe and pervasive hostile workplace in which she and other women were routinely demeaned, diminished and subjected to degrading sexual harassment." (*Id.* ¶ 53.) For example, when Dunbar joined the HP team in April 2016, the Agency placed her in charge of a male employee who had been the subject of prior complaints that the Agency had ignored, and whose intimidating and explosive behavior led Dunbar to fear for her physical safety. (*Id.* ¶¶ 54–57.) The Agency required Dunbar to monitor the male employee's compliance with a "special 'behavior contract'" created for him despite Dunbar's repeated complaints of the employee's threats and abuse, and though he was

3

eventually terminated, Dunbar continued to fear reprisal after his departure.  (*Id*. ¶¶ 58–59.)  In August 2016, Global Managing Director Jim Sexton ("Sexton") deliberately placed Dunbar next to a powerful senior male client during a meeting in which the client openly flirted with Dunbar, sat uncomfortably close to her, and passed her inappropriate notes.  (*Id*. ¶ 61.)  When confronted by Dunbar, Sexton "admitted that he directed Dunbar to sit close to his important client 'so he would have someone pretty, young, and sexy beside him.'"  (*Id*.)  Dunbar reported this incident as sexual harassment but her complaint was ignored, prompting Brian Hutter ("Hutter"), Dunbar's direct supervisor on the HP team (*see id*. ¶ 34) to blame Dunbar "for being a 'difficult' woman." (*Id*. ¶ 62.)  In the fall of 2017 Sexton berated Dunbar and screamed at her over the phone following a difficult HP client meeting (*id*. ¶ 63), and "Sexton twice touched Dunbar in an unwanted and offensive sexual manner."  (*Id*. ¶ 64.)  During a fall 2017 business trip to San Francisco, CEO Boyle loudly and repeatedly used the word "cunt" during a meeting at which Dunbar was the only female present, lamenting its underuse in the "PC culture."  (*Id*. ¶ 66.)  Dunbar felt degraded by the incident but feared termination if she were to report it.  (*Id*. ¶¶ 66–67.)  And although Hutter privately applauded Dunbar's work, he belittled and humiliated her in front of the HP team, complaining of her "strong opinions," characterizing her as a "nagging wife," and in one incident suggesting that she tape her mouth shut.  (*Id*. ¶¶ 68–73.)  Hutter and other supervisors also excluded Dunbar from opportunities afforded to less experienced male employees, including by requiring that Dunbar alone obtain special permission from Hutter and Sexton to travel to client meetings. (*Id*. ¶ 74.)

For years the Agency's culture has been permeated by an implicit understanding that complaints of discrimination and sexual harassment will not be taken seriously, and it is widely understood that Brammer is dedicated to protecting male executives.  (*Id*. ¶¶ 75–76.)  During her

tenure with the Agency Dunbar took it upon herself to challenge this environment and to mentor younger female colleagues.  (*Id*. ¶ 77.)  Through these interactions Dunbar learned that a male employee whose reputation for workplace sexual misconduct was widely known had sexually assaulted a female subordinate in the presence of another male employee in 2014.  (*Id*. ¶¶ 78–79.)  The female employee reported the assault to Brammer, who failed to hold the male employee accountable; he was instead promoted to one of the Agency's highest executive management positions.  (*Id*. ¶¶ 78–79.)  Based on her own experience and that of her female coworkers, Dunbar complained to Hutter, reported sexual harassment and discrimination to Brammer as well as other supervisors, and asked the Agency to remedy its inadequate sexual harassment and discrimination training, but the Agency failed to address her complaints.  (*Id*. ¶¶ 81–82.)  The Agency also neglected to interfere with numerous instances of sexual harassment and sexual misconduct perpetuated by a male IT engineer against multiple TracyLocke employees on the grounds that the IT engineer was employed by an outside company.  (*Id*. ¶¶ 83–85.)

Despite these challenges Dunbar's performance assessment for 2016-2017 yielded "exceptional" ratings in numerous categories (*id*. ¶ 34) and she began pursuing a promotion to Group Creative Director.  (*Id*. ¶ 86.)  Dunbar expressed her interest in this position to Executive Creative Director Phil Camarota ("Camarota"), who was far less experienced than Dunbar and largely ignored her interest and efforts to take on new business opportunities, instead funneling these opportunities to men.  (*Id*. ¶¶ 87–89.)  Camarota eventually informed Dunbar that "rather than promoting Dunbar, he was transferring a younger, less qualified, and less experienced male Creative Director, Chris DeSalvo, to the HP team and diverting many of Dunbar's projects and responsibilities to him—effectively demoting Dunbar," though Camarota referred to the move as a "restructuring."  (*Id*. ¶¶ 90–91.)  Dunbar was the last member of the HP team to learn of the

restructuring, which she believed was a punitive measure undertaken as part of the Agency's and Brammer's campaign to marginalize Dunbar for her efforts to pursue equal treatment and confront workplace harassment and discrimination.  (*Id*. ¶¶ 92–94.)   On March 8, 2018, TracyLocke prepared "TL Props to Her" cards in recognition of International Women's Day, through which employees could extend "props" to female employees via cards that were displayed on an office wall.  (*Id*. ¶ 96.)   Despite recognizing Dunbar for "rockn' out a ton of great work on a daily basis and guiding the team to greatness" with a props card, on that same day Hutter exploded with anger after Dunbar asked him to delineate her role in relationship to that of Chris DeSalvo.  (*Id*. ¶ 98.) During the meeting "Hutter verbally abused and physically intimidated" Dunbar, "declaring: 'Now you and I are going to have a confrontation.'"  (*Id*.)

Approximately three weeks later, on March 27, 2018, the Agency terminated Dunbar's employment "in retaliation for making sexual harassment and discrimination complaints to her supervisors and HR, for requesting and pursuing equal treatment and for her equality advocacy." (*Id*. ¶¶ 99–100.)   Brammer, who had flown in from Texas, informed Dunbar in a meeting with Camarota and Hutter present that Dunbar "was being terminated effective immediately and directed her to gather her personal things and leave the building under escort, without speaking to anyone." (*Id*. ¶ 100.)  Brammer cited Dunbar's "disloyalty" in updating her professional portfolio and exploring other employment opportunities, although Dunbar never worked on her portfolio during business hours and Dunbar knew of other male employees who had directed female subordinates to develop portfolios for them who were not subject to adverse employment actions. (*Id*. ¶¶ 101–102.)  Dunbar also had knowledge of other male employees who had openly sought new employment but who were offered financial incentives to remain with the Agency instead of facing termination.  (*Id*. ¶ 102.)

Following her departure Dunbar retained counsel, who invited Omnicom and TracyLocke to participate in confidential pre-litigation negotiations to resolve Dunbar's claims of employment discrimination.  (*Id*. ¶¶ 107–108.)  Omnicom and TracyLocke declined to participate, and Dunbar filed her claims against the two entities with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  (*Id*. ¶ 110.)  Despite receiving notice of these filings through counsel, the Agency failed to respond to the CHRO's requests for information and documents during the investigative process.  (*Id*. ¶¶ 111–14.)

Dunbar was provided the 2018 copy of the Agency's employee handbook (the "Handbook") after her termination, which states that it is applicable to employees of all Omnicom subsidiaries and affiliates.  (*Id*. ¶¶ 35, 37.)  The Handbook prohibits sexual harassment of any kind, which it defines as "unwelcome sexual advances, requests for sexual favors and/or other verbal, visual or physical conduct of a sexual nature when . . . the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."  (*Id*. ¶ 38.)  The Handbook also emphasizes "the Agency's 'legal duty to retain and preserve materials that might be requested in a pending or anticipated legal proceeding, audit or investigation'" and contains protocols for preserving and retaining Agency records, including emails, in the event of a litigation hold.  (*Id*. ¶¶ 116–18.)

Dunbar notified Brammer and the Agency of her intent to contact legal counsel regarding her retaliatory termination during the March 27, 2018 meeting.  (*Id*. ¶ 120.)  Despite awareness of the Agency's policies, both Brammer and the Agency violated their duties and obligations to undertake appropriate steps to retain documents and prevent the spoliation of evidence in the face of this notice.  (*Id*. ¶ 119.)  Instead, the Agency "knowingly and intentionally destroyed Plaintiff's

entire email account in a manner intended to ensure that information and evidence relating to the Agency's and Brammer's misconduct and Dunbar's claims would be irretrievable."  (*Id*. ¶ 121.) The Agency also "wiped" Dunbar's company laptop clean, thereby further rendering information and evidence relating to Dunbar's claims unrecoverable.  (*Id*. ¶ 122.)

Dunbar's claims were cited in a December 2019 *New York Times* article entitled "#MeToo Clashes with 'Bro Culture' at Ad Agencies," which states that "Teresa Brammer, the agency's chief human resources officer, said that Ms. Dunbar's accusations were found by external investigators to be without merit, adding that 'there is no higher priority than creating a safe, fair and equitable workplace for our associates.'"  (*Id*. ¶ 124.)  Dunbar asserts that this statement is false and defamatory and was made with knowledge of its falsity and/or reckless disregard for its truth.  (*Id*.)  Dunbar has suffered economic harm and emotional distress, as well as public shame and ridicule, as a result of the injuries to her name and reputation in the advertising industry stemming from this article.  (*Id*. ¶ 127.)

Based on these allegations, Dunbar brings claims against all of the Agency Defendants for: sexual harassment due to a hostile work environment in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.* (Counts One and Two); pay discrimination on the basis of sex in violation of Title VII, the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206 *et seq.*, and the CFEPA (Counts Three, Four, and Five); retaliation in violation of Title VII, the EPA, and the CFEPA (Counts Six, Seven, and Eight); wrongful termination in violation of Title VII, the EPA, and the CFEPA (Counts Nine, Ten, and Eleven); and breach of contract (Count Twelve).  She also asserts a libel *per se* claim against Brammer and the Agency Defendants (Count Thirteen). Defendants move pursuant to Fed. R. Civ. P. 12(b)(6) for dismissal of all Plaintiff's claims against

OMS, DDB and Brammer, and for dismissal of Plaintiff's libel claim in its entirety.  Defendants also move pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings on each of Plaintiff's claims asserted under the EPA against Omnicom.

**Standard of Review**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept the complaint's factual allegations as true and must draw inferences in the plaintiff's favor.  *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  A motion filed pursuant to "Rule 12(b)(6) must be decided on 'facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'"  *Lunardini v. Mass. Mut. Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) (quoting *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (brackets omitted).  The "complaint must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678) (brackets omitted).

"A party may move for judgment on the pleadings 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'"  *Rojas v. Berryhill*, 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019) (quoting *Burns v. Int'l Sec. Serv., Inc. v. Int'l Union, United Plant Guard Workers*, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*)).  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for

failure to state a claim." *Hogan*, 738 F.3d at 514–15 (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006)).

## Discussion

### Title VII and CFEPA Claims Against DDB and OMS

Defendants first argue that because Plaintiff failed to name DDB or OMS in her charges filed with the EEOC and the CHRO, she failed to exhaust her administrative remedies and her Title VII and CFEPA claims against these two Defendants must therefore be dismissed.  In the alternative Defendants assert that Plaintiff has failed to state a claim for relief against these entities under Title VII or the CFEPA because Plaintiff failed to plead an employer-employee relationship between herself and either DDB or OMS, and because certain of Plaintiff's allegations, even if such a relationship were adequately pleaded, fall outside the statute of limitations.  Because the Court agrees with Defendants that Plaintiff has failed to exhaust her administrative remedies, the Court need not decide whether Plaintiff has adequately pled that the Agency Defendants are sufficiently integrated so as to constitute a single employer under the relevant statutory schemes.[1]

---

[1] Necessary or not, the Court observes that Dunbar's argument that the issue of "[w]hether two [or more] related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss," *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014), is compelling.  This inquiry requires the Court to consider "evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  *Id.* (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)).  While Courts have recognized that a plaintiff must do more than recite "mere boilerplate allegations" in order to put defendants on adequate notice that she intends to assert a single employer theory of liability, *Li v. Ichiro Sushi, Inc.*, No. 14-CV-10242 (AJN), 2016 WL 1271068, at *6 (S.D.N.Y. Mar. 29, 2016) (quoting *Bravo v. Established Burger One, LLC*, No. 12-CV-9044 (CM), 2013 WL 5549495, at *7 (S.D.N.Y. Oct. 8, 2013)), Dunbar's intention in this regard is hardly a mystery. And although Dunbar's allegations that: (1) Omnicom exercises extensive control over TracyLocke's, DDB's, and OMS's operations and personnel decisions; (2) OMS in turn exercises extensive control over TracyLocke's and DDB's HR and IT functions; and (3) DDB exercises extensive control over TracyLocke's personnel decisions and operations (FAC ¶¶ 16–18) provide only minimal factual detail to support the contention that these four entities should be considered a single employer, the Court does not find these allegations so deficient as to warrant dismissal at this stage. *See, e.g.*, *Addison v. Reitman Blacktop, Inc.*, 283 F.R.D. 74, 84 (E.D.N.Y. 2011) (holding that "Plaintiffs have put the Defendants on notice of the theory of employer liability by alleging that, upon information and belief, 'at all times material to this action, the corporate Defendants formed a 'single integrated enterprise' as they shared common management, finances, and/or other resources'" and thus motion for leave to amend was not futile).

"Before bringing a Title VII suit in federal court, an individual must first present 'the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency.'" *Littlejohn*, 795 F.3d at 322 (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (*per curiam*)).  "A prerequisite to commencing a Title VII action against a defendant is the filing with the EEOC or authorized state agency of a complaint naming the defendant." *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991).  However, the obligation to exhaust administrative remedies with the EEOC is a mandatory claims processing rule and not a jurisdictional prerequisite to suit.  *See Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1850–51 (2019).  Nonetheless, Title VII claims can be subject to dismissal for failing to exhaust administrative remedies where a plaintiff failed to name a later-sued defendant in the EEOC complaint.  *See, e.g.*, *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620 (2d Cir. 1999).

Likewise, "[i]t is undisputed that CFEPA claims must initially go through the CHRO, and may not be sued upon until the CHRO grants a release of jurisdiction."  *Fried v. LVI Servs., Inc.*, 557 Fed. App'x 61, 63 (2d Cir. 2014) (summary order).  With respect to CFEPA claims, unlike Title VII claims, a plaintiff's "failure to . . . bring his complaint to the CHRO forecloses his access to judicial relief, because it depriv[es] the trial court of jurisdiction to hear his complaint."  *Sullivan v. Bd. of Police Comm'rs of City of Waterbury*, 196 Conn. 208, 217–18, 491 A.2d 1096 (1985).  Thus, "[w]here a plaintiff has obtained a release for his or her discrimination claims from the CHRO but failed to include a particular defendant in the CHRO complaint, courts of this District have consistently found a lack of subject matter jurisdiction over the [CFEPA] claims as to the

---

In arguing that Dunbar has not sufficiently alleged that Omnicom, DDB, or OMS were her employer, Defendants also cite the "immediate control" or "economic reality" tests that are typically applied to determine joint employer liability under the Fair Labor Standards Act and other statutes. *See, e.g.*, *Serv. Employees Int'l Union, Local 32BJ v. N.L.R.B.*, 647 F.3d 435, 442–43 (2d Cir. 2011); *Marsteller v. Butterfield 8 Stamford LLC*, No. 3:14-CV-1371 (AWT), 2017 WL 4286364, at *5 (D. Conn. Sept. 27, 2017).  However, because it is apparent from Dunbar's complaint and her opposition to the motion to dismiss that she is alleging a single employer or enterprise theory of liability, she need not also allege facts supporting alternative joint employer theories of liability.

unnamed defendant[s]." *Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 273 (D. Conn. 2010) (citing cases).[2]

At issue here, is an exception recognized by the Second Circuit "to the general rule that a defendant must be named in the EEOC complaint," which "permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Johnson*, 931 F.2d at 209.  The Connecticut Appellate Court has adopted this exception with respect to CFEPA claims as well.  *See Malasky v. Metals Product Corp*, 44 Conn. App. 446, 453–56, 689 A.2d 1145 (App. Ct. 1997).  A four-part test is used "to determine whether an 'identity of interest' exists," which asks:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and] 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Johnson*, 931 F.2d at 209–10; *Malasky*, 44 Conn. App. at 453–454 (same).[3]  "[I]t is the plaintiff who has the burden of proving that the identity of interest exception applies." *Lewis v. Livingston*

---

[2] The Court must therefore construe Defendants' motion to dismiss Dunbar's CFEPA claims against DDB and OMS as a challenge to the Court's subject matter jurisdiction and will apply the standard applicable to a motion filed pursuant to Fed. R. Civ. P. 12(b)(1) with respect to this subset of claims. "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Mercer v. Schriro*, 337 F. Supp. 3d 109, 122 (D. Conn. 2018) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).  "[T]he party asserting subject matter jurisdiction 'bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.'" *P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 45–46 (D. Conn. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).  However where, as here, "the Rule 12(b)(1) motion is facial, *i.e.,* based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the 'Pleading'), the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

[3] For ease of reference, this identity of interest test shall be referred to as the *Johnson* test.

*Cty. Ctr. for Nursing & Rehab.*, 30 F. Supp. 3d 196, 205 (W.D.N.Y. 2014) (quoting *Senecal v. B.G. Lenders Serv. LLC*, 976 F. Supp. 2d 199, 214 (N.D.N.Y. 2013)).

In crafting this exception, the Second Circuit observed that because EEOC "charges generally are filed by parties not versed in the vagaries of Title VII and its jurisdictional and pleading requirements," interpretation of the statute's procedural requirements warrants "a flexible stance." *Johnson*, 931 F.2d at 209 (internal quotation marks omitted). Citing this language in *Johnson*, "the majority of courts seem to favor a finding that the 'identity of interest' doctrine applies only to a *pro se* filer," although the Second Circuit has not reached the issue. *Lafferty v. Owens, Schine & Nicola, P.C.*, No. 3:09-CV-1045 (MRK), 2012 WL 162332, at *9 (D. Conn. Jan. 18, 2012); *see also Margarite Consolmagno v. Hosp. of St. Raphael Sch. of Nurse Anesthesia*, No. 3:11-CV-109 (DJS), 2016 WL 11575100, at *2 (D. Conn. Apr. 21, 2016) ("Since the time of the Second Circuit's decision in *Johnson*, some district courts in this Circuit have concluded that *pro se* status at the administrative stage is a necessary prerequisite to the application of the identity of interest exception, while others have applied the exception in cases where a complainant was represented by counsel"). And while the *Johnson* test has likewise been applied to claims brought under the CFEPA, "Courts in this district have consistently held that the 'identity of interests' exception to the requirement that defendants be named in the preceding CHRO complaint only applies when the plaintiff was not represented by counsel before the CHRO.'" *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008); *accord Anderson*, 718 F. Supp. 2d at 275 (holding that "the exception only applies to *pro se* filings with the relevant administrative agencies"). Indeed, the *Malasky* case, which is the only appellate authority in the state courts to discuss the identity of interest exception, involved a plaintiff that was self-represented at the time

she filed the CHRO complaint, a factor specifically cited by the appellate court.  *Malasky*, 44 Conn. App. at 455–56.

Here, Dunbar was represented by counsel at the time that she filed her EEOC and CHRO complaints but nonetheless asks this Court to apply the identity of interest exception to permit her claims to proceed against DDB and OMS under both Title VII and the CFEPA.  She cites the following allegations in arguing that the *Johnson* test tips in her favor: (1) DDB and OMS had actual notice of the EEOC and CHRO charges filed against Omnicom and TracyLocke; (2) Omnicom exercises substantial control over DDB's, OMS's, and TracyLocke's personnel decisions and operations; (3) DDB was Dunbar's employer as defined by applicable federal and state law and exercised extensive control over TracyLocke's personnel decisions and operations; and (4) OMS exercised extensive control over the HR and IT functions of both DDB and TracyLocke.  (Pl.'s Opp'n to Mot. to Dismiss at 5, ECF No. 111 (citing FAC ¶¶ 112, 16–18).) Dunbar also relies on  *Christiansen v. Omnicom Grp., Inc.*, 167 F. Supp. 3d 598 (S.D.N.Y. 2016), *aff'd in part, rev'd in part*, 852 F.3d 195 (2d Cir. 2017), which involved an employment discrimination suit brought by a DDB employee against DDB and Omnicom even though the latter was not named in the plaintiff's administrative complaints.  The district court dismissed the complaint on other grounds but with respect to the exhaustion issue found "that at this stage of the litigation, Plaintiff has pleaded sufficient facts to support his contention that naming DDB in his administrative complaints relieved him of his obligation to name Omnicom separately," applying the *Johnson* test.  *Id*. at 610 n.4.  Specifically, the court found that while the first *Johnson* factor weighed against the Plaintiff, the others favored him where he "allege[d] that counsel for Omnicom participated in a 'conciliatory mediation process' with Plaintiff and has received notice of all charges filed . . . that Omnicom 'exercises extensive control' over DDB's 'operations and

personnel decisions' . . . and that rules regarding employee conduct were directly established by Omnicom." *Id.*

In response, DDB and OMS argue that the fact that Plaintiff was represented by counsel at the administrative stage categorically precludes her ability to invoke the identity of interest exception and that even if the exception were available, the *Johnson* factors militate against its application. Defendants also distinguish *Christiansen*, which concluded that the interests of the named subsidiary (DDB) were identical to that of its unnamed parent company (Omnicom), in a "vertical" wholly owned parent-subsidiary relationship. Here, by contrast, Dunbar seeks to have the Court excuse her failure to name DDB and OMS as affiliates of TracyLocke, which reflect a "horizontal" relationship to the named party, and which are subsidiaries of named party Omnicom. According to Defendants, this difference defeats a finding of unity of interest at the second step of the *Johnson* test. Defendants also point out that Omnicom participated in mediation during the administrative stage in *Christiansen* despite the fact that it was not named in the plaintiff's administrative complaints. Here, DDB and OMS are not alleged to have been involved in the administrative proceedings at all.

The Court agrees with the Defendants that the identity of interest exception is not applicable here. First, with respect to the CFEPA, Dunbar has not cited any authoritative case indicating that the failure to name a defendant in a CHRO complaint may be excused where the plaintiff was counseled before the CHRO.[4] To the contrary, and as noted above, the cases largely indicate that whether or not the claimant was counseled is typically a threshold inquiry before the

---

[4] Dunbar cites *Williams v. Quebecor World Infiniti Graphics, Inc.*, No. 3:03-CV-2200 (PCD), 2007 WL 926901, at *3 (D. Conn. Mar. 23, 2007), in which the court affirmed its earlier denial without prejudice of the defendants' motion to dismiss in light of certain factual issues that rendered the identity of interest question more appropriate for resolution after trial. While the court recognized the exception despite the fact that "Plaintiff was represented by counsel in the administrative proceedings," in doing so the court relied upon cases involving Title VII and other federal statutes and did not address the question presented here of whether a more restrictive rule applies under Connecticut law. *See id.*

test is applied. *Anderson*, 718 F. Supp. 2d at 275; *Robinson*, 578 F. Supp. 2d at 390; *see also, e.g.*, *Chassie v. Sprigs & Twigs, Inc.*, No. KNLCV146020965S, 2014 WL 7525499, at *3 (Conn. Super. Ct. Nov. 21, 2014) ("Courts have consistently held that this identity of interests exception to the requirement that defendants be named in the preceding CHRO complaint only applies when the plaintiff was not represented by counsel before the CHRO") (quotation marks and citation omitted). And as noted previously, the only appellate authority recognizing the exception involved a self-represented claimant at the time the CHRO complaint was filed. *Malasky*, 44 Conn. App. at 455–56. Finally, given the Connecticut Supreme Court's holding that the failure to exhaust administrative remedies before the CHRO deprives the court of subject matter jurisdiction, *see Sullivan*, 196 Conn. at 217–18, this Court is especially reluctant to interpret the exception in a manner that would enlarge this Court's subject matter jurisdiction beyond that specifically countenanced by controlling state law.

As for Dunbar's Title VII claims, even if the Court were to "consider[] whether [Dunbar] had counsel before the EEOC" as "a non-dispositive factor in determining whether to apply the 'identity of interests' exception," *Consolmagno v. Hosp. of St. Raphael*, No. 3:11-CV-109 (PCD), 2011 WL 4804774, at *7 n.14 (D. Conn. Oct. 11, 2011), as opposed to a threshold requirement, the Court finds that the *Johnson* factors weigh in favor of DDB and OMS. *See also Senecal*, 976 F. Supp. 2d at 216 (concluding "that a plaintiff's legal representation at the time of his or her EEOC filing is informative when considering the first and fourth *Johnson* factor" but does not pose a categorical bar to invoking the exception). Regarding the first factor, Dunbar has offered no response to Defendants' contention that she could easily have ascertained DDB's and OMS's alleged role in the employment conditions and actions of which she complains from Omnicom's website, SEC filings, or the Employee Handbook from which the FAC quotes—a supposition

16

which is all the more reasonable given Dunbar's early retention of counsel. (Defs.' Mem. in Support of Mot. to Dismiss at 20, ECF No. 91.) Defendants also point to the fact that Dunbar identified herself as a former DDB employee in the charge documents she filed with the EEOC and CHRO, thus establishing her knowledge of DDB at that time. (Carannante Decl. Exs. A, B ¶ 8, ECF Nos. 87-1, 87-2.[5])

At the second step of the inquiry, the Court agrees with the Defendants that the FAC alleges largely conclusory allegations on the issue of similarity of interest between DDB, OMS, and the named Defendants. Merely alleging that "OMS exercised extensive control over DDB's and [TracyLocke's] human resources . . . and information technology . . . functions" and that "DDB exercised extensive control over [TracyLocke's] operations and personnel decisions" (FAC ¶¶ 17–18) does not, without more, plausibly suggest that the interests of TracyLocke and Omnicom are so similar to that of DDB and OMS "that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include [OMS and DDB] in the" administrative proceedings. *Johnson*, 931 F.2d at 209–10; *cf. Kearney v. Kessler Family LLC*, No. 11-CV-06016, 2011 WL 2693892, at *7 (W.D.N.Y. July 11, 2011) ("Courts have regularly found the identity of interest exception inapplicable in the franchisor-franchisee context when a plaintiff fails to identify the franchisor in the EEOC charge, and later sets forth conclusory allegations regarding the franchisor's 'right to control' the franchisee"). The FAC therefore does not set forth sufficient facts from which the Court can conclude that TracyLocke was so interconnected with its horizontal affiliates, DDB and OMS, as to compel a finding that the second *Johnson* factor favors Plaintiff.

---

[5] The documents that the Plaintiff filed in connection with the administrative proceedings, of which she had knowledge and which are referenced in the complaint (FAC ¶ 110), are subject to judicial notice on a motion to dismiss pursuant to Rule 12(b)(6). *See, e.g.*, *Falcon v. City Univ. of New York*, 263 F. Supp. 3d 416, 423–24 (E.D.N.Y. 2017).

Third, Defendants argue that DDB and OMS have suffered prejudice by virtue of their lost opportunity to resolve this dispute outside of litigation, including during the administrative proceedings.  Dunbar responds by citing Omnicom's and TracyLocke's admission that "Plaintiff's counsel provided notice to Defendants concerning her filing of the complaints with the CHRO and the EEOC by way of letter dated July 30, 2018."  (Omnicom Answer to FAC ¶ 108, ECF No. 84; *see also* Tracylocke Answer to FAC ¶ 108, ECF No. 85.)  It is unclear whether this statement was intended to extend to DDB and OMS when neither entity has yet filed an answer to the FAC and thus neither Defendant appears to have made such a judicial admission.  *See Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("Facts admitted by a party are judicial admissions that bind that party throughout the litigation") (quotation marks, alterations, and citation omitted).  Defendants also refute such a proposition in their reply brief.  (Defs.' Reply at 3 n.3, ECF No. 119.)  However even assuming *arguendo* that OMS and DDB had notice of the Plaintiff's CHRO and EEOC charges before this lawsuit was filed, a showing of actual prejudice at step three of the *Johnson* test is not necessary to find the *Johnson* exception otherwise inapt.  *See Ayala v. U.S. Postal Serv.*, No. 15-CV-4919 (VSB), 2017 WL 1234028, at *5 n.6 (S.D.N.Y. Mar. 31, 2017), *aff'd sub nom. Ayala v. United States Postal Serv.*, 727 F. App'x 15 (2d Cir. 2018) (dismissing claims for failure to exhaust where *Johnson* test was not met, even though the unnamed defendant did not argue that it suffered actual prejudice).

Fourth, Defendants emphasize the complete absence of non-conclusory allegations from which it can be inferred that either DDB or OMS represented to Dunbar that her relationship with DDB or OMS should be undertaken via Omnicom or TracyLocke.  And while Dunbar argues that "the FAC includes substantive allegations concerning DDB's and OMS's involvement in the adverse employment actions Plaintiff experienced" (Pl's. Opp'n to Mot. to Dismiss at 6), none of

these allegations identify DDB's or OMS's role or actions specifically; they instead sweep these entities in with the FAC's collective references to "the Agency" without distinction.  Moreover, in addition to the four *Johnson* factors, some courts have considered whether the unnamed "defendant is named in the body of the charges of having played a role in the discrimination," in determining whether to apply the exception.  *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 311 (S.D.N.Y. 2014) (quotation marks and citation omitted); *see also, e.g.*, *Joseph v. United Techs. Corp.*, No. 14-CV-424 (AWT), 2015 WL 851895, at *4 (D. Conn. Feb. 26, 2015).  Neither DDB nor OMS are so much as mentioned in Dunbar's charges as allegedly contributing to the alleged discrimination, which, to the contrary, she attributed only to TracyLocke and Omnicom.

In sum, given that Dunbar was represented by experienced counsel during the administrative proceedings before initiating this action and that the *Johnson* factors weigh, on balance, in Defendants' favor, the Court declines to apply the exception to the general rule that Dunbar's failure to name OMS and DDB in her administrative complaints before the EEOC precludes her from seeking Title VII relief against these entities before this Court.

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss as to Dunbar's Title VII and CFEPA claims against OMS and DDB.[6]

### EPA Pay Disparity Claims Against DDB, OMS, and Omnicom

Defendants next argue that Dunbar has failed to state a pay disparity claim under the EPA with respect to DDB and OMS, as she has not alleged that either entity was responsible for her compensation or that either paid different wages to male employees.  Defendants further assert in

---

[6] Defendants also argue that Dunbar's discrimination and retaliation claims under Title VII and the CFEPA are time-barred to the extent that they are premised on Dunbar being hired as a freelancer and not a full-time employee in 2015, and on her hiring as an Associate Creative Director rather than a Creative Director in 2016.  (Defs.' Mem. in Support of Mot. to Dismiss at 23–24.)  Because Defendants only sought dismissal of Plaintiff's Title VII and CFEPA claims against OMS and DDB, and because the Court has concluded that it must dismiss the claims against these entities on exhaustion grounds, the Court does not further address these arguments at this time.

the motion for judgment on the pleadings that Dunbar has failed to plead sufficient facts to support a pay disparity claim under the EPA against Omnicom, including because she has failed to allege facts from which Omnicom can be considered her employer under the statute.  The Court agrees with Defendants that Dunbar has failed to state a plausible pay discrimination claim against any of these three Defendants.

"The Equal Pay Act prohibits an employer from 'paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 451 (S.D.N.Y. 2014) (quoting 29 U.S.C. § 206(d)(1)).  To prevail on an EPA pay discrimination claim, a plaintiff must ultimately "demonstrate that '1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions.'"  *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254–55 (2d Cir. 2014) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).  "At the pleading stage, then, a plausible EPA claim must include 'sufficient factual matter, accepted as true' to permit 'the reasonable inference' that the relevant employees' job *content* was 'substantially equal.'"  *Id*. at 256 (quoting *Iqbal*, 556 U.S. at 678); *see also Fairchild v. Quinnipiac Univ.*, 16 F. Supp. 3d 89, 96 (D. Conn. 2014) ("Even at the motion to dismiss stage, vague, conclusory, and speculative allegations will not save an Equal Pay Act claim.") (quoting *Bass v. World Wrestling Federation Enter., Inc*., 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001)).  "The plaintiff must make specific allegations 'about the actual content of the work done' and cannot res[t] on 'broad generalizations drawn from job titles and divisions.'"  *Verdone v. Am. Greenfuels, LLC*, No. 3:16-

CV-01271 (VAB), 2017 WL 3668596, at *5 (D. Conn. Aug. 24, 2017) (quoting *Port Auth. of New York & New Jersey*, 768 F.3d at 256).

Dunbar responds to Defendants' challenge to her claims against OMS and DDB by asserting that because the FAC pleads that "all Agency Defendants operate as a single employer and both DDB and OMS exercise excessive control over TracyLocke's human resources and personnel decisions," this Court can consider DDB and OMS Dunbar's employer for purposes of her EPA pay discrimination claim.[7]  (Pl.'s Opp'n to Mot. to Dismiss at 6.)  Dunbar fails to address adequately however the paucity of allegations in support of her EPA claims.  And because the FAC pleads only conclusory allegations in support of an EPA pay discrimination claim and does not include any facts suggesting that a male Creative Director at any of the Agency's affiliates was paid more than Dunbar for substantially equal work, the Court agrees with the Defendants that these claims must be dismissed not only as to DDB and OMS but also as to Omnicom, as sought in Defendants' motion for judgment on the pleadings.

Dunbar's only relevant allegations concerning pay discrimination appear to stem from her contention that while working "[a]s a freelancer, Dunbar was not entitled to receive valuable benefits (including health, dental, and vision insurance coverage, participation in the Agency's retirement plan, and related employer contributions) male employees doing comparable work received," and that "[a]lthough she had more writing and creative leadership experience than most, if not all, members of her team, the Agency repeatedly denied her requests for the full-time employment status and attendant benefits every male member of her team received."  (FAC ¶ 31.)

---

[7] The single employer doctrine that Dunbar relies upon throughout her briefing has also been recognized under the Fair Labor Standards Act ("FLSA"), of which the EPA is a part.  *See Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 133 (S.D.N.Y. 2020) (explaining that "[t]he single employer rule was developed by the National Labor Relations Board in the collective bargaining context, and has since been adopted by courts and extended to various employment law contexts," including the FLSA); *e.g.*, *Belfi*, 191 F.3d at 134 (noting that the EPA is part of the FLSA). Largely for the reasons articulated in footnote two, *supra*, the Court rejects the Defendants' arguments that the EPA claims should be dismissed for failure to allege adequately an employer-employee relationship with DDB or OMS.

Even assuming *arguendo* that these allegations are not time-barred as Defendants contend, they fail to state a plausible EPA discrimination claim.  In enacting the EPA, "Congress rejected statutory language encompassing 'comparable work' to instead mandate equal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Port Auth. of New York & New Jersey*, 768 F.3d at 254 (quoting 29 U.S.C. § 206(d)(1)).  Thus, Dunbar's invocation of "comparable work" and vague allusions to other male team members fails to plead facts consistent with the "demanding" standard under which the jobs to be compared must be found "substantially equal."  *Id.* at 255 (quotation marks and citation omitted).  Courts regularly dismiss EPA claims where, as here, particularized allegations of equal work are lacking.  *See, e.g.*, *Hernandez v. Premium Merch. Funding One, LLC*, No. 19-CV-1727, 2020 WL 3962108, at *15 (S.D.N.Y. July 13, 2020) (dismissing EPA claim where plaintiff "does not allege that her male colleagues performed equal work on jobs requiring equal skill, effort, and responsibility, or that these jobs were performed under similar working conditions"); *Adams v. Northstar Location Servs., LLC*, No. 09-CV-1063, 2010 WL 3911415, at *6 (W.D.N.Y. Oct. 5, 2010) (dismissing EPA claim where "Plaintiff does not describe her job responsibilities in comparison to the job responsibilities of the male recruiter").[8]

---

[8] In her opposition to the Defendants' motion for judgment on the pleadings (ECF No. 112) Dunbar cites *Chepak v. Metro. Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (summary order), where the Second Circuit held that a plaintiff's assertions "that she was given a different title, but required to do the same job for less pay, as her male predecessors," were "sufficient to survive a motion to dismiss" in the absence of more specific allegations.  That conclusion, however, was predicated on the plaintiff's "*pro se* status."  *See id*.  Here, moreover, while Dunbar recites the "equal work" standard in boilerplate fashion (FAC ¶ 158), she does not otherwise allege that she performed the "same" or "equal" work to a male employee of OMS, DDB, or Omnicom; instead she refers only vaguely to "comparable work."  (FAC ¶ 31.)  Dunbar also argues that her allegations are sufficient given that she has not had the benefit of discovery.  *Cf. Port Auth. of New York and New Jersey*, 768 F.3d at 258 (observing that "the EEOC's failure to include [nonconclusory] factual allegations followed a three-year investigation into the Port Authority's pay practices—an investigation conducted with the Port Authority's cooperation—is of some note.").  However even at this early stage Dunbar's allegations must still "suggest 'more than a sheer possibility' that" DDB, OMS, or Omnicom "violated the EPA," *id*. at 258–59, and the Court finds that the FAC's barebone allegations fail to transcend that mere possibility.

Nor does Dunbar identify a male comparator who received a higher salary. *See Rivera v. Children's & Women's Physicians of Westchester, LLP*, No. 16-CIV-714 (PGG) (DCF), 2017 WL 1065490, at *11 (S.D.N.Y. Mar. 18, 2017) (dismissing EPA claim as "too vague and conclusory" where *pro se* plaintiff alleged, *inter alia*, that "she discovered that [the defendant] paid other less qualified, junior medical assistants an hourly rate greater than that which she was paid," as "[t]he Complaint does not identify any male employee who performed substantially similar work to Plaintiff, and who was compensated at a higher hourly rate") (quotation marks and alterations omitted); *Suzuki v. State Univ. of New York Coll. at Old Westbury*, No. 08-CV-4569 (TCP), 2013 WL 2898135, at *4 (E.D.N.Y. June 13, 2013) (dismissing EPA claim where, *inter alia*, "plaintiff does not identify any male faculty members in her department during the relevant time with similar experience who earned more for substantially similar work").

Instead, Dunbar pleads in general terms that in 2018, Omnicom "reported a gender pay gap of 30.2%, one of the most egregious among large advertising companies." (FAC ¶ 48.) Even accepting this statistic as true, such general allegations of company-wide pay disparity, standing alone, are insufficient to sustain a plausible inference that Dunbar herself was the victim of unequal pay for equal work. *See Wang v. Gov't Employees Ins. Co.*, No. 15-CV-1773 (JS) (ARL), 2016 WL 11469653, at *7 (E.D.N.Y. Mar. 31, 2016) (finding that "Plaintiff has failed to plausibly allege disparities in pay based on sex" where "Plaintiff broadly states that 'GEICO has engaged in a widespread, deep-rooted racially discriminatory employment practice of paying [her] and other minority female employees less than it pays Caucasian and male employees'").[9]

---

[9] Dunbar also relies upon her allegation that Camarota "effectively demoted" Dunbar by diverting many of Dunbar's responsibilities and projects to Chris DeSalvo, a younger, less experienced, and less qualified male Creative Director. (Pl.'s Opp'n to Mot. to Dismiss at 7.) Aside from the fact that Dunbar does not describe DeSalvo's lesser qualifications nor identify the nature of the work that he performed relative to Dunbar, nowhere does Dunbar allege that DeSalvo was in fact paid more for equal work.

Because Dunbar has failed to allege sufficient facts to sustain the inference that the job content of a male employee of OMS, DDB, or Omnicom was substantially equal to that of Dunbar and that a male employee of any of these entities was accordingly paid more than Dunbar for equal work, the Court GRANTS Defendants' motion to dismiss Plaintiff's EPA pay discrimination claims against OMS and DDB, and GRANTS Defendants' motion for judgment on the pleadings with respect to Plaintiff's EPA discrimination claim against Omnicom.  Although Defendants have not sought any relief with respect to Plaintiff's EPA pay discrimination claim against TracyLocke, the Court dismisses this claim for the same reason.  *See, e.g.*, *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc*., 219 F. Supp. 2d 576, 580 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159 (2d Cir. 2004) ("[W]hile dismissing a complaint as to a non-moving defendant is not an ordinary practice, a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue") (footnote omitted).  Dismissal of the Plaintiff's EPA claims as to all of the Agency Defendants is without prejudice to the filing of an amended complaint which addresses the deficiencies identified herein.

**EPA Retaliation Claims**

"The anti-retaliation provision of the FLSA, of which the EPA is a part, states in relevant part that it shall be unlawful 'to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter.'"  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quoting 29 U.S.C. § 215(a)(3)).  "[A]n employee may premise a section 215(a)(3) retaliation action on an oral complaint made to an employer, so long as . . . the complaint is 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content

and context, as an assertion of rights protected by the statute and a call for their protection.'"
*Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 107 (2d Cir. 2015) (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)).  "To establish a presumption of retaliation at the initial stage of litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 312 (S.D.N.Y. 2016) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  "At the pleading stage, a plaintiff is not required to allege specific evidence as to each *prima facie* element, but rather must plead facts sufficient to render [her] claim plausible."  *Cabrera v. CBS Corp.*, No. 17-CV-6011 (CM), 2018 WL 1225260, at *3 (S.D.N.Y. Feb. 26, 2018).  In the context of the EPA the standard requires that a plaintiff "show that she raised the issue of potentially 'gender-related' disparate pay for substantially similar work, but she need not have cited the EPA or accused her employer of illicit conduct."  *Johnson*, 224 F. Supp. 3d at 315 n.17; *see also Baguidy v. Boro Transit Inc.*, 283 F. Supp. 3d 14, 31 (E.D.N.Y. 2017) ("Though specific mention of the FLSA is not necessary to make a 'complaint,' some courts hold that a plaintiff must at least hint at the illegality of the defendant's conduct").

The parties agree that Dunbar's termination constitutes an adverse employment action but disagree as to whether the FAC adequately pleads that Dunbar participated in a protected activity of which DDB, OMS, and/or Omnicom were aware.  As relevant to her EPA retaliation claim, Dunbar alleges that "[b]ased on information and belief, as early as 2016, Dunbar's complaints about Defendants' discriminatory conduct," which included "gender-based discriminatory pay," "had been reported to, and were the topic of concern and internal discussion by, her male

supervisors and Brammer."  (FAC ¶ 60.).  Dunbar further alleges that she "joined with other women in the Agency's Connecticut office to launch 'Feminist Fridays' . . . to raise awareness about sexual harassment and discrimination at the Agency, and more effectively advocate for equal pay and equal opportunity for professional development and promotions."  (*Id.* ¶ 95.)  According to Dunbar, her termination was carried out "in retaliation for making sexual harassment and discrimination complaints to her supervisors and HR for requesting and pursuing equal treatment and for her equality advocacy."  (*Id.* ¶ 99.)

Defendants assert that the FAC "contains no factual allegations indicating that Plaintiff ever complained to any specific person, whether at TracyLocke, DDB, OMS or Omnicom about her own compensation."  (Defs.' Mem. in Support of Mot. to Dismiss at 28.)  They further argue that "these threadbare allegations of alleged generic griping to unidentified people about pay are insufficient to state an EPA claim against Omnicom" and challenge Dunbar's failure to allege "which supervisors and/or Human Resources personnel she allegedly complained to, what those complaints were, when they were made, and/or how she otherwise opposed 'discriminatory compensation.'"  (Defs.' Mem. in Support of Mot. for J. on the Pleadings at 11–12, ECF No. 92.)  Defendants cite *Baguidy*, 283 F. Supp. 3d at 31, where the district court dismissed the plaintiff's FLSA retaliation claim for, *inter alia*, failing to put the defendant on notice that the plaintiff was asserting his statutory rights, citing the plaintiff's failure to allege any facts concerning "the contexts in which the[] complaints were made and the content of the complaints," and concluding that "Plaintiff's allegations amount to nothing more than 'abstract grumblings,' which do not create a retaliation claim."  (quoting *Valerio v. Putnam Assocs.*, 173 F.3d 35, 44 (1st Cir. 1999)).

The Court agrees with Defendants that the FAC fails to set forth the requisite specificity to allege a plausible EPA retaliation claim against OMS, DDB, or Omnicom.  While on a motion to

dismiss, Dunbar need not necessarily "allege with such specificity the who, what, when, and where that Defendants suggest is required," her pleadings must at least "give Defendants adequate notice and plausibly allege that [she] engaged in protected activity." *Cabrera*, 2018 WL 1225260, at *5. Here, the FAC contains only the barest of allegations that Dunbar complained of "gender-based discriminatory pay" and "advocate[d] for equal pay" through the "Feminist Fridays" initiative. (FAC ¶¶ 60, 95.)   Nowhere does the FAC indicate that Dunbar "*ever* complained, let alone repeatedly, that defendants were engaged in a violation of law" or otherwise made a complaint to Defendants that set forth "a clear articulation of facts indicative of illegality" as opposed to having presented generalized grievances about the Agency's practices.  *See Dunn v. Sederakis*, 143 F. Supp. 3d 102, 112–13 (S.D.N.Y. 2015); *see also Kassman*, 925 F. Supp. 2d at 473 (holding that plaintiff's complaints "about her salary cut . . . discrimination generally . . . and harassment and disparate treatment generally" failed "to state a retaliation claim under the FLSA or the New York Labor Law, as there is no indication that any Plaintiffs were actually complaining of EPA or NYSEPA violations such that these complaints constituted 'an assertion of rights protected by the statute' and a 'call for their protection.'") (quoting *Kasten*, 563 U.S. at 14).  Indeed, the FAC does not include any allegation that Dunbar complained to anyone about her pay being unfairly or illegally lower than that of her male counterparts.

In short, because the FAC fails to suggest plausibly that Dunbar ever invoked the EPA or presented a complaint to the Defendants about her alleged pay disparity—oral or otherwise, Defendants' motion to dismiss the EPA retaliation claims against OMS and DDB is GRANTED without prejudice, and Defendants' motion for judgment on the pleadings with respect to the EPA retaliation claim against Omnicom is likewise GRANTED without prejudice to the filing of an

amended complaint.  As with the EPA pay disparity claims, the Court will also dismiss *sua sponte* the parallel EPA retaliation claims as to TracyLocke without prejudice.[10]

### Libel Claim Arising from Brammer's Statement to the *New York Times*

Defendants next argue that Plaintiff has failed to state a claim of libel based on Brammer's statement to the *New York Times* because her statement was a non-actionable opinion, and because the statement did not injure Dunbar in her profession so as to constitute a case of libel *per se*.

"At common law, to establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinski*, 319 Conn. 394, 430, 125 A.3d 920 (2015) (quotation marks and brackets omitted).  "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 431 (quoting *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004)).  "[T]o be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury." *Id.* (quoting *Cweklinsky*, 267 Conn. at 228–29).  The statement must also "convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Crismale v. Walston*, 184 Conn. App. 1, 18, 194 A.3d 301 (App. Ct. 2018).

---

[10] The Court reaches the same conclusion with respect to Dunbar's purported wrongful termination claim under the EPA against all Agency Defendants (Count Ten), which appears wholly duplicative of her EPA retaliation claim.  (*See* FAC ¶ 208 (alleging that the Agency Defendants "terminated Dunbar's employment in retaliation for her complaining to supervisors and HR about discriminatory compensation and actively promoting equal compensation for herself and other female employees of the Agency").)  Nor does Dunbar identify any authority to support the notion that the EPA recognizes a separate cause of action for wrongful termination or wrongful discharge.

Defamation is "actionable *per se*" if it either "charges a crime which involves moral turpitude or to which an infamous penalty is attached," or it "injure[s] a man in his profession and calling." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (quoting *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 843, 850–51, 863 A.2d 735 (App. Ct. 2005)).  As to the latter category, the defamation "is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business." *Lowe v. City of Shelton*, 83 Conn. App. 750, 766–67, 851 A.2d 1183 (App Ct. 2004) (citation omitted).  "Once the plaintiff has established that the words are false and actionable per se, barring any statutory provision to the contrary, she is entitled under Connecticut law to recover general damages without proof of special damages." *Silano v. Cooney*, 189 Conn. App. 235, 242, 207 A.3d 84 (App. Ct. 2019) (quoting *Miles v. Perry*, 11 Conn. App. 584, 602, 529 A.2d 199 (App. Ct. 1987)).

As noted previously, Dunbar's libel *per se* claim is based on an alleged defamatory statement Brammer published to the *New York Times*.  Specifically, Plaintiff alleges:

> In a widely disseminated article titled, "#MeToo Clashes with 'Bro Culture' at Ad Agencies," Brammer asserts *as fact* the following statement wrongly accusing Dunbar of making false claims against the Agency: "Teresa Brammer, the agency's chief human resources officer, said that Ms. Dunbar's accusations were found by external investigators to be without merit, adding that 'there is no higher priority than creating a safe, fair and equitable workplace for our associates.'"

(FAC ¶ 124.)  The FAC also includes a hyperlink to the *New York Times* article dated December 22, 2019,[11] which Defendants have separately filed along with a request for judicial notice.  In it, the alleged defamatory statements attributed to Brammer are preceded by the following statement:

> In a discrimination lawsuit filed against TracyLocke in June, Ms. Dunbar claimed that male colleagues referred to her as a "nagging wife," suggested taping her mouth shut, threw papers in her face and rubbed her back in view of colleagues. She also accused Hugh Boyle, the company's chief executive, of encouraging "male managers and subordinates to

---

[11] https://www.nytimes.com/2019/12/22/business/media/ad-industry-sexism.html (last accessed February 17, 2021).

incorporate" a vulgar term for female genitalia "into their workplace dialogue." (The suit has yet to be resolved.)

(Defs.' Ex. 1, ECF No. 88-1.)

Defendants first assert that Brammer's statement that "Ms. Dunbar's accusations were found by external investigators to be without merit" is not actionable because it is an opinion and not a statement of fact. "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . . In a libel action, such statements of fact usually concern a person's conduct or character . . . . An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." *NetScout Sys., Inc. v. Gartner, Inc.*, 334 Conn. 396, 411, 223 A.3d 37 (2020) (quoting *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 111, 448 A.2d 1317 (1982)). "Context is a vital consideration in any effort to distinguish a nonactionable statement of opinion from an actionable statement of fact." *Id*. at 412. The Connecticut Supreme Court has synthesized from the relevant case law three overarching considerations to be applied in determining whether an alleged defamatory statement is an actionable statement of fact: "(1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification." *Id*. at 414. "Whether a statement is an assertion of a fact or an assertion of an opinion is a question of law." *Crismale*, 184 Conn. App. at 18.

Defendants rely on a series of cases which hold, generally, that "press statements, released by parties to commercial litigation, and/or statements by a litigant condemning an opponent's legal claims as 'baseless,' 'frivolous,' or without merit, [are] non-actionable opinions, and therefore not libelous or defamatory, as a matter of law." (Defs.' Mem. in Support of Mot. to Dismiss at 31.)

30

*See Traylor v. Parker*, No. FSTCV135015533S, 2016 WL 5003981, at *4 (Conn. Super. Ct. Aug. 4, 2016) (holding "that any statements contained in the broadcast to the effect that the plaintiff's lawsuits were frivolous, or that they were varied or imaginative are statements of pure opinion," as "[c]ourts in this state and others, as well as federal courts, have consistently determined that characterizing a lawsuit as frivolous, foolish or in some other derogatory manner constitute matters of opinion"); *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 471 (S.D.N.Y. 2011) ("[A] statement condemning an opponent's legal claims as 'baseless' is mere opinion and is not defamatory") (applying New York law); *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1403, 88 Cal. Rptr. 2d 843 (Cal. Ct. App. 1999) ("[T]he numerous descriptions of the lawsuit and the motion as 'stupid,' 'laughed at,' 'a joke,' 'spurious,' and 'frivolous,' are common characterizations which are nothing more than 'the predictable opinion' of one side to the lawsuit.") (applying California law).

The Court takes no issue with these principles. But they simply have no application here. Brammer is not alleged to have merely characterized Dunbar's suit as baseless or frivolous; instead, she allegedly stated to the *New York Times* that "Ms. Dunbar's accusations were found by external investigators to be without merit." (FAC ¶ 124.) Thus, even allowing that the context in which the statement was made involved an "evaluative" component vis-à-vis the litigation, "the nature and tenor of the actual language used by [Brammer] suggests" a reliance upon "objective fact"—*i.e.*, the outcome of an external investigation. *NetScout Sys.*, 334 Conn. at 414. Moreover, the statement itself is "subject to objective verification," *id.*, as both the fact of whether an external investigation was undertaken, and if so, its outcome, can be ascertained.[12]

---

[12] For this reason the Court also finds distinguishable *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360 (S.D.N.Y. 1986), a case cited by the Defendants applying New York law. There, the defendant was a public relations agent that had composed a press release describing a recent Second Circuit decision that had vacated a preliminary injunction

Nor is the Court persuaded by Defendants' assertion that the fact that the *New York Times* article indicated that the lawsuit "has yet to be resolved" rendered the statement "incapable of proof or disproof" (Defs.' Mem. in Support of Mot. to Dismiss at 32) because of the ongoing nature of the lawsuit.  Whether or not an external investigation was conducted, concluded, and either corroborated or defeated Dunbar's allegations are questions wholly distinct from the status of the lawsuit.

Defendants next argue that because Brammer's alleged statement does not impugn Plaintiff's professional integrity, it does not constitute libel *per se* and the claim must accordingly be dismissed insofar as Dunbar has not alleged special damages.  None of the parties has cited particularly helpful or relevant case law on this issue.  At this stage the Court declines to dismiss Dunbar's defamation claim on this basis.  First, when read in the context of an article describing a discrimination lawsuit brought by a former employee against her former employer, an alleged statement by the employer's Human Resources Director that the former employee's lawsuit was determined to be without merit could reasonably call that employee's professional integrity into question.  Moreover, it is reasonable to infer that such a statement could harm that employee's efforts to procure subsequent employment within the same field.  Second, even assuming that Dunbar has not pled a case of libel *per se* and must proceed on a theory of libel *per quod*, she has alleged special damages in the form of economic loss from damage to her career.  "Connecticut

---

brought by its client against the plaintiff in the context of another lawsuit.  *See id*. at 361–62.  The press release stated, *inter alia*, that the judicial decision "supports our claims that [the plaintiff] defrauded [the client]."  *Id*. at 362.  Because this statement constituted "a comment on an ongoing court battle" made on behalf of a party to the litigation, the district court found it to be a non-actionable opinion.  *See id*. at 365.  The court further noted that "[a]s one interpretation of a relatively complex and lengthy judicial opinion, the statement in question could never be proven right or wrong, much less 'true or false,'" as "whether the Second Circuit approved of [the client's] claims on the merits is still an open question."  *Id*.  Here, by contrast, Brammer did not allegedly state that the external investigators' findings "supported" the Agency's litigation position but, rather, allegedly made an affirmative statement that Dunbar's accusations were investigated by a third party and found by that third party to be meritless.  Her statement therefore *could* be proven true or false.

courts have held that allegations of economic loss need not be very detailed," and have accepted, at the pleading stage, the "allegation that slanderous statement caused 'economic loss and loss of business income' or a mere allegation of 'economic damages.'" *Marshall v. Webster Bank, N.A.*, No. 3:10-CV-908 (JCH), 2011 WL 1303373, at *2 (D. Conn. Apr. 6, 2011) (citing *Cavallaro v. Rosado*, No. CV054009939, 2006 WL 2949143, at *9–*10 (Conn. Super. Ct. Oct. 5, 2006), and *Ambrozaitis v. Lord*, No. CV0540044557S, 2006 WL 2949140, at *1 (Conn. Super. Ct. Oct. 3, 2006)) (alterations and ellipsis omitted). Dunbar does allege that she has suffered economic harm and faced damages to her career as a result of the alleged defamation. (FAC ¶ 127.) At this stage, these allegations are sufficient to state a case of libel *per quod*.

Accordingly, Defendants' motion to dismiss the libel *per se* claim is DENIED.[13]

### Contract Claims Against DDB and OMS

Finally, Defendants argue for dismissal of Plaintiff's breach of contract claim against DDB and OMS. This claim is asserted against all Agency Defendants and is premised on the Agency's alleged breach of its sexual harassment policies as set forth, *inter alia*, in the Employee Handbook. (FAC ¶¶ 223–30.) Defendants argue in conclusory fashion that the claim must be dismissed because Dunbar's employment was at-will and she does not allege any policy or contract that precluded Defendants' right to terminate Dunbar. Alternatively, DDB and OMS assert that Dunbar fails to allege facts supporting her allegation that DDB or OMS breached the sexual harassment policy contained in the Employee Handbook by failing to investigate or act upon any of Dunbar's complaints. Dunbar responds by citing *Brosler v. Food Automation-Serv. Techniques, Inc.*, No.

---

[13] Defendants also ask the Court to dismiss the Plaintiff's retaliation claims to the extent they are predicated on the alleged libelous statement. (Defs.' Mem. in Support of Mot. to Dismiss at 34.) The Court has already dismissed Plaintiff's Title VII and CFEPA retaliation claims as to OMS and DDB and Plaintiff's EPA retaliation claims in their entirety. The Court expresses no view as to the merits of Defendants' assertion with respect to the remaining Title VII and CFEPA retaliation claims against TracyLocke and Omnicom as Defendants have not moved to dismiss these claims.

3:96-2345 (DJS), 1997 WL 711438, at *4 (D. Conn. Aug. 25, 1997), a case which denied a motion to dismiss a breach of contract claim involving a sexual harassment policy in the defendant's handbook without discussion of the propriety of basing a contract claim on such an alleged promise.  She also cites *Patterson v. Waterford Hotel Grp., Inc.*, No. 3:09-CV-926 (JBA), 2010 WL 11566253, at *2 (D. Conn. Mar. 2, 2010), in which the district court observed that "[u]nder Connecticut law, an employment manual may under appropriate circumstances, provide a basis for finding that an employment contract existed which limited the employer's right to discharge the employee, even when the employment is at-will."  (quotation marks and citations omitted).

Because resolution of this issue appears to require consideration of facts outside of the complaint, the Court does not find this issue appropriate for disposition under Rule 12(b)(6). While Dunbar quotes from the Employee Manual in her complaint and Defendants assert that the Handbook contains a contract disclaimer, the Handbook is not attached to the pleadings, so even if incorporated into or integral to the complaint, the Court cannot ascertain whether or to what extent it may have created binding obligations on any of the parties.  Defendants, moreover, do not differentiate any basis for dismissing the contract claims against OMS and DDB specifically as opposed to Omnicom and TracyLocke, other than their disavowal of Plaintiff's single employer theory, which Defendants do not address in the context of the breach of contract claim.[14]  The Court, in any event, would not deem this an adequate basis for dismissal at this juncture for the reasons discussed in footnote two, *supra*.  The motion to dismiss the breach of contract claims is therefore DENIED.

---

[14] Indeed, the Defendants asserted that the Court need not assess the sufficiency of Dunbar's single employer allegations if the Court agrees with Defendants, as the Court has, that Dunbar failed to exhaust her Title VII and CFEPA claims against OMS and DDB.  (*See* Defs.' Mem. in Support of Mot. to Dismiss at 23.)

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 86) is GRANTED in part and DENIED in part. The Title VII and CFEPA claims against DDB and OMS are DISMISSED with prejudice and the EPA claims against DDB, OMS, and TracyLocke are DISMISSED without prejudice to the filing of an amended complaint. The motion is otherwise DENIED. Defendants' motion for judgment on the pleadings as to the Plaintiff's EPA claims against Omnicom (ECF No. 89) is GRANTED without prejudice to the filing of an amended complaint. Any amended complaint must be filed on or before **March 22, 2021.**

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of February 2021.


*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE