UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KAREN DUNBAR, | : | Civil Action |
| | : | |
| Plaintiff, | : | Case No. 3:19-cv-00956 (KAD) |
| | : | |
| v. | : | |
| | : | |
| OMNICOM GROUP INC., OMNICOM | : | |
| MANAGEMENT SERVICES, DDB | : | |
| WORLDWIDE COMMUNICATIONS, | : | |
| TLP, INC. dba TRACYLOCKE, | : | |
| and TERESA BRAMMER, | : | |
| | : | |
| Defendants. | : | March 22, 2021 |

## SECOND AMENDED COMPLAINT

Plaintiff Karen Dunbar ("Dunbar" or "Plaintiff") by her attorneys, Lucas & Varga LLC,

for her Second Amended Complaint against Omnicom Group, Inc., Omnicom Management

Services, DDB Worldwide Communications Group Inc. and TLP, Inc. dba TracyLocke

(collectively, "the Agency" or "Defendants") and Teresa Brammer ("Brammer"), alleges as

follows:

## NATURE OF THE ACTION

1.     Karen Dunbar is a well-regarded, high-performing advertising executive with a

track record of accomplishment and success in her field.  Over a career spanning nearly three

decades, Dunbar has worked her way through the ranks of the industry's most prestigious

agencies and advised on accounts for high-profile clients including Grand Marnier, Moet &

Chandon, Dom Perignon, Hennessy, Liberty Mutual, DLJ Direct, Olympus, Keds, Aetna,

Reebok, UPS, and Virgin Atlantic Airways.

2.     Based on her extensive professional experience and achievements, in 2015,

Dunbar was well-qualified for a position as Creative Director or Group Creative Director, but for

almost a year of her employment with the Agency was relegated to a temporary position as a copywriter.  At that time, Dunbar had substantially more experience than most, if not all, male members of the creative teams to which she was assigned.  As Dunbar soon learned, the Agency's deeply entrenched "good old boys" culture is pervasive in the halls and permeates the walls.  Powerful men facilitate and perpetuate a sexist culture in which demeaning and discriminatory conduct toward women is not only tolerated but rewarded.

3.      At the Agency, female employees who want to get their foot in the door often are relegated to temporary, part-time, lower-level, and lesser-paying positions than comparably-qualified males.  This discriminatory practice keeps women in the slow lane for career advancement while male counterparts are fast-tracked to receive higher-level, better-paying positions with more opportunities for professional advancement.  This discriminatory practice makes it difficult, if not impossible, for female employees, including Dunbar, to catch up to male counterparts in terms of pay, promotions, and power.

4.      At the Agency, male supervisors and co-workers suggested taping Dunbar's mouth to silence her, implied she needed a "facelift," offensively laid their hands on her bare skin in front of male subordinates, used their larger builds to physically intimidate her, and marginalized Dunbar as a token sex object to appease client expectations.

5.      At the Agency, senior male managers and creative leaders groom junior male employees to embrace the Agency's discriminatory and unlawful conduct.  Men in the highest echelons of leadership engage in offensive and sexist conduct signaling that denigrating and harassing women is business as usual and complaining about it is an exercise in futility.

6.      In his position as CEO of TracyLocke, Hugh Boyle unabashedly encouraged male managers and subordinates to incorporate the term "cunt" into their workplace dialogue.[1]  At one point, a male Group Account Director, Curtiss Bruno, brazenly groped a subordinate female employee's breasts in public while a subordinate male co-worker looked on.

7.      For years, female employees have complained to the Agency and human resources about the Agency's pervasive hostile work environment to no avail.  The Agency's unchecked and unrepentant sexist culture and discriminatory practices unfairly and discriminatorily force female employees, time and again, to make an untenable choice:  either work in the Agency's demeaning hostile workplace or leave.  Victims often leave.  Male abusers stay and are rewarded and promoted by the Agency.

8.      Despite this environment, during her tenure at TracyLocke, Dunbar received glowing praise for her performance and was considered one of the firm's rising stars—in part because of her strong work ethic, commitment to excellence, and strong advocacy on behalf of her clients.  Dunbar also vocally advocated on behalf of herself and other female employees on her creative team, insisting that they be afforded the same opportunities for professional advancement and leadership positions as similarly- or less-qualified male colleagues.

9.      In March 2018—less than three weeks after establishing "Feminist Friday's," a group created to provide a support system, outlet, and voice for TracyLocke's female employees—the Agency abruptly terminated Dunbar's employment without notice or cause.  After firing the group's mentor and role model, the Agency self-servingly feigned and continues

---

[1] Plaintiff recites profane language "as it was spoken in order to present and properly examine the social context in which it arose.  We do not explicate vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created 'an environment that a reasonable person would find hostile or abusive.'"  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010).

to feign support for "Feminist Fridays" as a marketing tool to deceptively portray itself as a champion of diversity and inclusion. The truth is different.

10.     During an ambush termination meeting orchestrated by Brammer and as memorialized by Brammer on or about March 27, 2018, Dunbar immediately and explicitly notified Brammer and the Agency that she was engaging an attorney about her unlawful termination.  Despite receiving Dunbar's unambiguous notice of potential litigation, and in violation of explicit "Omnicom Document Retention Guidelines in the event of Investigation/Litigation," the Agency intentionally, permanently and irretrievably destroyed Dunbar's entire email account and completely "wiped" her laptop clean in a manner ensuring that any forensic examination conducted by Plaintiff to retrieve or restore information supporting her claims would be futile.

11.     In violation of Federal and Connecticut anti-discrimination and anti-retaliation statutes and Connecticut common law, the Agency and Brammer are engaged in an ongoing retaliatory campaign to sully Dunbar's professional reputation and to silence other women from calling out misconduct, assault and harassment at the Agency through intimidation.  In December 2019, Brammer and the Agency publicly accused Dunbar of making false claims against Defendants, knowingly and wrongly impugning her character and professional integrity in a statement by Brammer widely disseminated by the *New York Times*, asserting *as fact* that "Ms. Dunbar's accusations were found by external investigators to be without merit."

12.     Plaintiff brings this action to remedy gender discrimination, sexual harassment, wrongful discharge, and retaliation for her opposition to unlawful practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, *et seq*. ("CFEPA").

13.     Plaintiff also brings this action to remedy Brammer's and the Agency's intentional and malicious publication of false and defamatory *per se* accusations maligning Plaintiff's character and professional integrity and intimidating other women from asserting their rights and speaking out about the Agency's entrenched sexist culture, hostile work environment and discriminatory practices.

14.     Plaintiff seeks compensatory and punitive damages, attorneys' fees, injunctive and declaratory relief, and appropriate legal and equitable relief.

## PARTIES

15.     Plaintiff Karen Dunbar is a resident and domiciliary of Connecticut.  From May 2015 through March 27, 2018, she was an employee of Defendants Omnicom Group, Inc, DDB, and TracyLocke, at TracyLocke's Wilton, Connecticut office.

16.     Defendant Omnicom Group, Inc. ("Omnicom") is a publicly-traded global marketing and corporate communications company that employs approximately 78,000 people worldwide.  Omnicon is a New York corporation with a principal place of business in located in New York, New York. Omnicom is the parent company of Defendants Omnicom Management Services ("OMS"), DDB Worldwide Communications Group Inc. ("DDB") and TLP, Inc. dba TracyLocke ("TracyLocke").  Omnicom exercises extensive control over its subsidiaries OMS's, DDB's, and TracyLocke's operations and personnel decisions and at all relevant times these entities should be collectively viewed as Plaintiff's joint employer as defined by applicable Federal and State statutes, and engaged in the acts complained of in Connecticut.

17.     Defendant OMS is a wholly-owned subsidiary of Defendant Omnicom with a principal place of business located in Dallas, Texas.  According to its website, www.omsdal.com, OMS was formed in 1996 to provide "People, Business, and Information

5

Technology services to agencies under the Omnicom Group, Incorporated umbrella."  At all times relevant, OMS exercised extensive control over DDB's and TracyLocke's human resources ("HR") and information technology (IT) functions, and engaged in the acts complained of in Connecticut and was Plaintiff's employer as defined by applicable Federal and State statutes, and engaged in the acts complained of in Connecticut.

18.     Defendant DDB is a wholly-owned subsidiary of Defendant Omnicom and was and remains a corporation organized and incorporated under the laws of New York, with its principal place of business located in New York, New York.  At all relevant times, DDB exercised extensive control over TracyLocke's operations and personnel decisions, and was Plaintiff's employer as defined by applicable Federal and State statutes and engaged in the acts complained of in Connecticut.

19.     Defendant TracyLocke is a wholly-owned subsidiary of Defendant Omnicom. TracyLocke is a Delaware corporation with a principal place of business located in Wilton, Connecticut. TracyLocke employs more than 650 professionals in thirteen offices in the United States and abroad, including its Wilton, Connecticut office, and at all relevant times was Plaintiff's employer as defined by applicable federal and state statutes.

20.     Defendant Teresa Brammer, upon information and belief, is a resident and domiciliary of the State of Texas, and at all relevant times was and is employed by the Agency as Omnicom's HR Director and Chief Human Resources Director and engaged in the acts complained of in Connecticut.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Plaintiff's Title VII claims under

28 U.S.C. § 1331 and 42 U.S.C. § 2000e-(k) *et seq*.  This Court has supplemental jurisdiction

over Plaintiff's CFEPA and Connecticut common law claims pursuant to 28 U.S.C. § 1367.  This

Court has personal jurisdiction over Defendant Omnicom pursuant to Fed. R. Civ. P. 4 and Conn.

Gen. Stat. § 52-59b, because Omnicom engaged in the acts complained of in Connecticut.

22.     This Court has personal jurisdiction over Defendant OMS pursuant to Fed. R.

Civ. P. 4 and Conn. Gen. Stat. § 52-59b, because OMS engaged in the acts complained of in

Connecticut.

23.     This Court has personal jurisdiction over Defendant DDB pursuant to Fed. R. Civ.

P. 4 and Conn. Gen. Stat. § 52-59b, because DDB engaged in the acts complained of in

Connecticut.

24.     This Court has personal jurisdiction over Defendant TracyLocke pursuant to Fed.

R. Civ. P. 4 and Conn. Gen. Stat. § 52-59b, because TracyLocke engaged in the acts complained

of in Connecticut.

25.     This Court has personal jurisdiction over Defendant Brammer pursuant to Fed. R.

Civ. P. 4 and Conn. Gen. Stat. ¶ 52-59b, because Brammer engaged in the acts complained of in

Connecticut.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §

2000e-5(f)(3) because Defendants transact substantial business in this District, maintain an office

in this District, and the acts and omissions giving rise to Plaintiff's claims substantially occurred

in Connecticut.

27.     On September 13, 2018, Plaintiff filed a dual charge of discrimination against Defendants with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), complaint numbers 1920097 and 1920098, and the U.S. Equal Employment and Opportunity Commission ("EEOC"), complaint numbers 16A-2018-01854 and 16A-2018-01855.

28.     On March 27, 2019, the CHRO issued releases of jurisdiction, and the EEOC issued Notices of Right to Sue.

## FACTUAL ALLEGATIONS

### I.     Dunbar's Consistently "Exceptional" Performance

29.     Dunbar earned a Bachelor of Arts in English from Goucher College (Towson, Maryland); is a graduate of an elite advertising school, The Portfolio Center (Atlanta, Georgia); and received a Master's in Liberal Studies from Wesleyan University (Middletown, Connecticut).

30.     Dunbar is a highly-regarded writer and creative director in the advertising industry.  Prior to working at TracyLocke, Dunbar had 25 years of experience honing her skills at competitive and awarded-winning New York advertising agencies, including Korey, Kay & Partners; Ammirati & Puris, Kirshenbaum & Bond; Andersen & Lembke; and Oglivy & Mather. She had extensive experience working on high-profile client accounts including Grand Marnier, Moet & Chandon, Dom Perignon, Hennessy, 1-800 Flowers, Liberty Mutual, DLJ Direct, Olympus, Keds, Aetna, Reebok, UPS, and Virgin Atlantic Airways.  In short, she was exceptionally qualified for the creative leadership positions of Creative Director or Group Creative Director.

31.     On or about May 2015, Dunbar began working at the Agency's Wilton, Connecticut office as a freelance copywriter and creative director.  As a freelancer, Dunbar was not entitled to receive the same valuable benefits (including health, dental, and vision insurance coverage, participation in the Agency's retirement plan, and related employer contributions) male employees doing comparable work received.

32.     During her tenure at the Agency, Dunbar was the most highly-educated and experienced person in the TracyLocke creative department.  Although Dunbar had more writing and creative leadership experience than most, if not all, members of her team, the Agency repeatedly denied her requests for the full-time employment status and attendant benefits every male member of her team received.

33.     Dunbar worked long hours, consistently produced excellent work product, and successfully helped win client business.  TracyLocke Executive Creative Director Sanford Stein publicly commented that it was "madness" that the Agency had not hired Dunbar as an employee.

34.     Dunbar was assigned to work on the Neutrogena account. As the only female member of the Neutrogena team, she was excluded from professional opportunities and client contacts made available to younger and less qualified male team members. Unlike male team members, she was excluded from "team" correspondence and communications. Senior male management did not acknowledge or address her participation in "team" calls, while routinely acknowledging and addressing male team members. Dunbar's role was limited to "token" woman for purposes of client optics. On one illustrative occasion, Mr. Miller began a team call in which Dunbar was the only female participant with the exclusionary statement, "Gentlemen, you fucking crushed it." On another, the Executive Director of the Wilton office, Mr. Stein,

commented that it would be good to have "a female voice" on the line. Such gender-based comments were not directed at male employees.

35.    Dunbar remained silent in the face of such mistreatment in the hopes of being hired. In or about April 2016, the Agency offered Dunbar a position as Associate Creative Directive ("ACD") on the creative team handling one of TracyLocke's largest accounts, Hewlett Packard ("HP").  Stein publicly acknowledged that Dunbar was overqualified for the ACD position, but told her the only way she could be hired by the Agency as an employee (and thus become entitled to benefits) was to accept the ACD position. Stein later acknowledged to Dunbar's supervisor, Brian Hutter, that Dunbar "at any other agency would most certainly be a GCD [Group Creative Director]. She was a GCD at an agency that would never even take a look at me or my work."  Acceptance of an ACD position was not a requirement historically required of male hires into Creative Director ("CD") positions. Dunbar accepted the ACD offer in April 2016 and, at that time, was one of only four females in the Wilton office to hold ACD or CD positions out of 15 Creative Leadership Positions in that office. A few months after accepting the ACD position, she again requested a position as CD and was promoted to CD on the HP team.

36.    During Dunbar's onboarding process, an administrative staff member (Dana Donia) provided her with a copy of the Omnicom employee handbook.  Among other things, Ms. Donia advised Dunbar that she could work on freelance projects as long as the work was not for a competing client. This policy was confirmed during the course of Dunbar's tenure as she often saw creative staff members working on freelance projects using TracyLocke equipment.  It also was common, and accepted, practice for TracyLocke staff members to work on their individual portfolios while in the office.  This was consistent with Dunbar's extensive experience in the

advertising industry, where it was common practice to ask for samples of work product and to add them to one's portfolio.

37.     In a detailed written Performance Assessment for 2016-2017, Brian Hutter, Group Creative Director and Dunbar's direct supervisor, confirmed that Dunbar "contribute[d] to the agency above and beyond [her] assigned job."  Dunbar received the highest possible "Exceptional" rating on a wide range of qualities and competencies including:  intelligence, initiative, passion for the work and agency, masterful delivery of her role in the job, communication of standards and job expectations, accountability, mentoring others, leading change, diversity, and resource utilization.  Her work ethic was also deemed "exceptional."

## II.   The Agency's Employee Handbook Confirms Omnicom's Extensive Control Over Its Subsidiaries' Operations

38.     At all relevant times, the Agency maintained an "Employee Handbook" ("Handbook") specifying its employment policies and practices.  The Handbook provided to Dunbar by Defendants was an Omnicom Handbook.

39.     Based on information and belief, in pre-2018 iterations of the Handbook, "Omnicom's Group Policies" were positioned at the front of the Handbook.  Sometime after former employee Matthew Christiansen filed a high-profile $20 million sex discrimination lawsuit against Omnicom and DDB in 2015, Defendants moved "Omnicom's Group Policies" from the front to the very back of the Handbook as reflected by the 2018 Handbook produced by Defendants in this case after Dunbar's termination.

40.     Despite this, the entire 2018 Handbook still reflects policies specified by Omnicom and applicable during Dunbar's employment.  The Handbook at page 80 states that Omnicom Group Policies "are applicable to employees of all Omnicom Group Inc. subsidiaries and affiliates."  Employees are urged to "read these policies carefully as they contain very

important information regarding your employment with the Omnicom Group network of companies."

41.    The Handbook at page 81 states that "sexual harassment of any kind or harassment based on any other legally protected characteristic is expressly prohibited." Omnicom defines sexual harassment as "unwelcome sexual advances, requests for sexual favors and/or other verbal, visual or physical conduct of a sexual nature when . . . the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

42.    The Handbook at pages 8-9 defines "Sexual Harassment" as:  "Sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when . . .[s]uch advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment."  Examples of conduct that may constitute sexual harassment include:

- Unwelcome sexual advances—whether they involve physical touching or not

- Sexual epithets, slurs, jokes, written or oral references to sexual conduct, gossip regarding one's sex life; comments on an individual's body or comments about an individual's sexual activity, deficiencies or prowess

- Displaying sexually suggestive objects, pictures or cartoons

- Leering, whistling, brushing against the body, sexual gestures or suggestive or insulting comments

- Sending or circulating whether in print or electronic form, literature or communications (articles, magazines or emails) of a sexual nature

- Inquiries into one's sexual experiences; and

- Discussion of one's sexual activities

12

43.     The Handbook at page 82 states that "[a]cts that violate these policies will be considered outside the scope of employment and may result in disciplinary action and legal sanctions being taken against you, including where appropriate the immediate termination of employment."  The Handbook further claims that "[a]ll reports of possible violations about which management becomes aware will be promptly considered.  We will not punish any employee or representative for making any report in good faith."

44.     The Handbook at page 9 claims that "[a]ny employee, whether a supervisor or manager, who has reason to suspect sexual harassment is occurring must notify Human Resources or the General Counsel" but at page 83 states that "[i]f you have any doubts about whether any employee is adhering to these principles, you should feel free to discuss the matter with your supervisor, the financial manager for your unit or Omnicom's General Counsel's office"  or if you "just want to remain anonymous" you can call Omnicom's Internal "Control Line" (or hotline).

45.     "Omnicom Group Policies" and the "Omnicom Code of Business Conduct" expressly "apply to all directors, officers and employees of Omnicom Group Inc. and its majority-owned subsidiaries."  Anyone with questions about the Handbook is directed to contact Omnicom HR Director Brammer in Dallas, Texas.  The Handbook also lists Company contacts for employee issues in New York and Dallas.  Not a single company contact is in the Agency's Wilton, Connecticut office where Plaintiff worked.

46.     Unconscionably—and in stark departure from widely-accepted business practices followed by much smaller companies—during Dunbar's tenure there was no HR department, or even a single HR representative, in the Agency's Connecticut office— TracyLocke's second largest office in the United States with over 200 employees.

13

47.     The complete absence of an HR Department or HR presence of any kind in the Agency's Connecticut office (and other offices) perpetuated and fueled the Agency's "Mad Men" culture by empowering male supervisors, employees and contractors to engage in unchecked sexual harassment, abusive behavior and discriminatory practices toward subordinate female employees.  Not one HR person was minding the store to protect employees' rights, including Plaintiff's, to a safe, harassment-free workplace where women are afforded fair and equal opportunities to receive the same pay, titles, positions, promotions and professional opportunities as male counterparts.

48.     According to publicly-available information, in 2018, Omnicom generated global revenue of $15.28 billion.[2]  Despite the Agency's extraordinary wealth, and in the wake of multiple claims, EEOC charges and high-profile lawsuits, the Agency still had not seen fit to establish anything near adequate HR resources with competent and unbiased HR personnel properly equipped, trained and empowered to protect employees' rights mandated by Federal and State law.

III.    **Sex Discrimination Permeates the Agency's Corporate Culture: "*We Are in Every Sense a Band of Brothers*" – TracyLocke CEO, Hugh Boyle**

49.     The advertising industry has long been burdened with a reputation for abusive behavior toward women."[3]  While women make up about half of advertising industry employees, in 2018 they represented only about 12% of its creative directors.[4]

---

[2] https://www.statista.com/statistics/192696/omnicom-groups-annual-revenue/

[3] "Sexual Harassment Suit Naming Ad Agency Shines Light on Client Dealings," *Wall Street Journal*, January 23, 2018.

[4] "Sexism in Advertising:  They Talk About Diversity But Don't Want to Change," *The Guardian*, April 14, 2019.

50.     Even in an industry known for gender inequity, the Agency's culture of discrimination against women stands out as particularly pervasive.  Despite calls for greater inclusivity and a shift away from the advertising industry's history of misogyny, the Agency doubled down on its old school corporate culture.  When *D Magazine* asked TracyLocke CEO Hugh Boyle why he loves his job, he responded, "I feel honored every day to be leading a business with such a rich heritage both in the state of Texas and the advertising industry itself.  I also enjoy the people—the most talented and creative team I have worked with in my 25 years in the industry.  ***We are in every sense a Band of Brothers.***"[5]

51.     Male executives that comprised the Agency's "Band of Brothers" relished and reinforced the industry's historic "good old boys" culture.  Male managers and creative leaders groomed junior male employees to embrace and perpetuate their proud attitude of male superiority.  Men disproportionately dominated upper-level positions, which translated to disproportionately greater power and higher pay.  By contrast, female employees' career advancement was neither encouraged nor facilitated.  In 2018—the same year that Omnicom generated global revenue of $15.28 billion—it reported a gender pay gap of 30.2%, one of the most egregious among large advertising companies.[6]

52.     Publicly-available Glassdoor reviews described the Agency's pervasive discriminatory and hostile work environment:

　　a.  "The level of unprofessionalism exhibited by management was unprecedented."  (4.28.17)

　　b.  "Women and new hires are made to feel excluded and made fun of." (10.15.17)

_____

[5] "CEO Spotlight:  Hugh Boyle," *D Magazine*, July-August 2016.

[6] "Advertising's Gender Pay Gap Figures Make Sorry Reading," *More About Advertising*, April 5, 2018.

c. "Sexual harassment is rampant, discrimination is constant." (1.4.17)

d. "There is rampant favoritism and sexism going on, which contributes to the pervasively negative morale issues plaguing this once-nice place to work." (12.28.10) (Wilton, CT)

e. "[T]he HR department doesn't protect employees in instances of manager/co-worker inappropriateness and doesn't do anything about sexual harassment complaints (even if there have been MULTIPLE complaints about one person)." (10.12.17)

f. "HR lacks the ability to be unbiased and will always protect managers/ leadership." (3.8.18) (Wilton, CT)

g. "It's like Lord of the Flies in there, only worse." (12.28.10) (Wilton, CT)

h. "The saddest part is that management, at some of the highest levels, are fully aware of the issues, but choose to turn a blind eye to them." (12.28.10) (Wilton, CT)

i. "Instead, they're perfectly content to let TracyLocke turn into a sweatshop run by a pack of unfairly entitled 'Lost Boys' who have no idea how to properly run their teams or satisfy their clients." (12.28.10) (Wilton, CT)

j. "A toxic clique culture" (10.15.17)

k. "[A]ccount leadership bullies and is very unprofessional." (11.9.12) (Wilton, CT)

l. "Not a place for girls to get ahead." (4.9.18)

m. "Not a place for women to excel or be successful." (3.8.18) (Wilton, CT)

n. "Women are treated like children and can't get advanced or even get heard." (4.9.18)

o. "Boys club – Not a female friendly environment for account or creative." (11.13.15)

p. "Big time Boys Club." (4.19.18)

q. "[B]oys club mentality." (3.8.18) (Wilton, CT)

16

r.   "Most managers are promoted based on who you know and not performance."  (3.8.18) (Wilton, CT)[7]

53.   The Agency has a shameful track record of disregarding serious complaints of sexual harassment and abuse and facilitating a pervasive hostile work environment.  According to the Complaint filed by Matthew Christiansen in his libel and discrimination action against Omnicom, DDB and three male managers (Joe Cianciotto, Peter Hempel, and Chris Brown),[8] in about 2012, then-employee Shawna Laken filed a Federal EEOC complaint after Omnicom and DDB refused to acknowledge and address her complaints about Cianciotto's sexual harassment in the workplace.  An EEOC investigation commenced in about 2014 in which "[e]mployee witnesses attested to the EEOC of the pervasive hostile work environment at DDB and that their complaints to human resources and management were ignored for years."  Furthermore, "[m]any

---

[7] *See also* "Employees crying in the hallway and/or being screamed at by Upper Management is commonplace with no corrective action." (9.23.16); "True training about inclusivity is a must!!" (4.19.18); "When management is and has been an all-white male affair for a century, it's hard to bring fresh ideas to an aging agency." (10.15.17); "Sad" (4.28.17); "If you respect yourself at all, I suggest staying very far away." (4.28.17); "Without a doubt, the worst place I have ever worked in my entire career." (1.4.17); "The leadership is the worst I have ever seen." (1.4.17); "Management is the problem." (9.23.16); "Incompetent upper management." (9.23.16); "No internal process." (9.23.16); "No internal accountability." (9.23.16); "Zero transparency." (9.23.16); "Several current employees have a sneaking suspicion that TracyLocke leadership is recruiting people to fill out positive Glassdoor reviews to negate the TRUTHFUL, negative ones. PLEASE STOP." (9.23.16); "There's definitely a 'good ole boys' club, if you're in it you're golden." (2.9.16); "It is acceptable to hire women for lower level positions but promoting them to senior level leadership does not happen." (11.13.15); "Look at your management team. Extremely unprofessional and bias." (11.9.12) (Wilton, CT); "The Creative Department is run by a bunch of young, inexperienced boys who have never worked anywhere but TL, have zero management training." (12.28.10) (Wilton, CT); "Advice to Management:  Stop PRETENDING to listen and care while exacerbating the situation by rewarding bad behavior." (12.28.10) (Wilton, CT).

[8] *Christiansen v. Omnicom Group, Inc., et al,* U.S. District Court for the Southern District of New York, Case No. 15 CV 3440 (KPF) [Dkt. 4, ¶30].

complaints at exit interviews when employees left DDB were made verbally and in writing on

exit interview questionnaire[s]" but Omnicom and DDB ignored them.[9]

54.     Around the same time, in late 2014, Christiansen filed State and Federal EEOC

complaints charging Omnicom and DDB with sexual harassment and discrimination.   In 2015,

Christiansen filed his discrimination and libel lawsuit against Omnicom and DDB in Federal

Court in Manhattan. alleging, among other things, that:

- "For years, employees have complained to Defendants and human resources about the pervasive hostile environment."

- "Defendants Omnicom and DDB provided Cianciotto with counsel for years to defend him from the harassment complaints, and then shifted counsel to another firm to engage in a secret settlement between themselves after [Christiansen's] complaint was filed, allegedly so Defendants can release each other from liability."

- "[I]t was futile to complain about Joe."

- "It was understood that complaints about Joe would be ignored because Joe is friends with the Corporate Defendants."

- A former DDB Creative Director "said he complained about Joe to human resources that said they could not do anything."

- "Employees knew not to complain about Joe to human resources because they felt powerless knowing DDB ignored their complaints."

- After Christiansen filed his complaint, Defendants circulated a company-wide e-mail "to make it appear that [his] complaint was false when it [was] not and falsely stating that Plaintiff never made a previous complaint when he did."

[9] *Id.*

55.     In 2017, after engaging in two years of extremely rancorous litigation, Omnicom and DDB settled Christiansen's $20 million lawsuit shortly after the Second Circuit Court of Appeals reversed the District Court's order granting summary judgment in favor of Defendants and reinstating his sex discrimination claims.[10]

## IV.     Defendants Unrepentantly Continue to Violate the Law and Subject Dunbar and Other Female Employees to a Hostile Work Environment

56.     Based on information and belief, the number of sexual harassment and discrimination claims publicly brought against the Agency pales in comparison to countless non-public claims and complaints by employees throughout Omnicom's vast subsidiary network that have been ignored and disregarded for years.  Consistent with the Agency's disturbing track record detailed above, during her employment, Dunbar was subjected to a severe and pervasive hostile workplace in which she and other women were routinely demeaned, diminished and subjected to degrading sexual harassment.

### A.     Defendants Force Dunbar To Monitor A Misogynistic and Abusive Male Subordinate

57.     In April 2016, when Dunbar joined the HP team, Defendants placed her directly in charge of a male employee known office-wide for his poor performance and explosive and threatening demeanor toward women.  Predictably, the male subordinate lost his temper during nearly every encounter between them, including using his substantially larger size to physically intimidate Dunbar.

58.     When Dunbar suggested that the male employee revise a set of headlines, he abruptly threw papers in her face and shouted, "Here, you want some more headlines?"

---

[10]  *Christiansen v. Omnicom Group, Inc. et al.,* 852 F. 3d 195 (2d Cir. 2017).

59.     On another occasion, Dunbar learned that the male employee intended to leave work early without completing an assignment due before the end of the day.  Despite asking that male colleague Ryan Swierczek be present for this discussion because she feared for her safety, when Dunbar approached, the employee she had been directed to supervise shouted, "You can't tell me what to do!" then stood and clenched his fists to imply he intended to strike her as he bolted out of the room.

60.     Dunbar reported the male employee's assaultive and erratic behavior to Brian Hutter, Jim Sexton (TracyLocke Global Managing Director and HP Account Manager), and Brammer.  Despite prior complaints against him by others, all three ignored Dunbar's complaints for two months.  When Dunbar again asked Hutter and Brammer to reassign the abusive male employee, Hutter blamed Dunbar for his hostile behavior and told her to "Stop confronting [him] and just document everything."

61.     Sexton referred to the employee that Dunbar was required to supervise and monitor, over her objection, as "a psychopath who held the agency hostage."  Instead of terminating his employment, Defendants prepared a special "behavior contract" for him. Remarkably, despite her repeated complaints of abusive and threatening behavior, Defendants tasked Dunbar with personally monitoring and documenting the male employee's adherence to the special contract.  To keep her job, Dunbar complied with this assignment despite the anxiety, distress, and fear for her physical safety that she experienced whenever he was near her.

62.     Defendants terminated the abusive male employee only after he violated the special behavior contract created for him by Defendants.  Several of Dunbar's female colleagues expressed gratitude for the stand she took to protect them from the male employee, who intimidated and frightened them.  One female colleague indicated that she feared he would return

and "go postal."  Fearing physical reprisal, Dunbar could not bring herself to leave the office

without being accompanied by a male colleague for several weeks following the terminated male

employee's departure.

**B.      As Early as 2016, Defendants Are on Notice of Dunbar's Complaints
Protesting the Agency's Discriminatory Practices**

63.      Dunbar's complaints about the Agency's sexually-hostile workplace and gender-

based discriminatory pay, position and promotion practices were no secret.  Based on

information and belief, as early as 2016, Dunbar's complaints about Defendants' discriminatory

conduct had been reported to, and were the topic of concern and internal discussion by, her male

supervisors and Brammer.

**C.      Global Managing Director Jim Sexton Treats Dunbar as a Sex Object and
Punching Bag**

64.      In an August 2016 meeting at DDB's New York office, Jim Sexton instructed

Dunbar to sit directly next to a senior male client that the Agency aimed to please anyway it

could.  To keep her job, Dunbar, the sole woman attending the meeting, reluctantly sat next to

the powerful male client, dreading that she was being set up for sexual harassment.  Predictably,

the client moved uncomfortably close to Dunbar, passed her inappropriate notes, and flirted with

her during the meeting for all to see.  When Dunbar confronted Sexton about this humiliating

harassment, he admitted that he directed Dunbar to sit close to his important client "so [he]

would have someone pretty, young, and sexy beside him."  In true "good old boys" spirit, Sexton

then laughed.

65.     Again, Defendants failed to address Dunbar's complaints of harassment.  Dunbar reported her complaint that Sexton intentionally exposed her to sexual harassment to Nicole Nieporent, HP Group Account Director and one of the few women in TracyLocke's leadership. Nieporent declined to take up this subject with Hutter—who had dismissed similar complaints she had brought to him in the past—but she encouraged Dunbar to do so.  When Dunbar reported the incident to Hutter, he blamed her for being a "difficult" woman, and ultimately discouraged her from contacting HR.  Even after Dunbar informed Hutter that Sexton had confessed to intentionally exposing her to a senior client's harassment, he did nothing.  Rather than take any step to investigate or address the incident, Hutter merely shook his head and said, "one day he's going to get in trouble."

66.     In Fall 2017, Sexton abusively berated Dunbar on the phone after a poor HP client meeting.  Sexton screamed at Dunbar for "thinking she was so fucking smart" and for "always having to have the last word."  Dunbar's husband overheard Sexton screaming through the phone and remarked that he could not believe the abuse to which her supervisors subjected her.

67.     Sexton twice touched Dunbar in an unwanted and offensive sexual manner.  In October 2017, Sexton sensually rubbed Dunbar's back while they passed through a public area of the office, humiliating and objectifying her in full view of many employees, including male subordinates.  In January 2018, Sexton shamelessly placed his hands on the only section of Dunbar's back uncovered by her square-cut dress—in full view of Hutter and approximately seven co-workers—just moments before she gave a phone presentation to HP representative Antonio Lucio.

**D.    TracyLocke CEO Hugh Boyle Celebrates the Word "Cunt"**

68.    The Agency's culture of sex inequality, discrimination, and harassment rained down from the men at the top, including TracyLocke CEO and "Band of Brothers" Commander Hugh Boyle.

69.    On a Fall 2017 business trip to the San Francisco offices of BBDO, another wholly-owned Omnicom subsidiary, Boyle commented that Americans are too hesitant to use the word "cunt."  Lamenting "PC culture," he repeated the word several times, loudly and clearly, while awaiting the BBDO and HP clients' arrival at a meeting.  Once again, Dunbar was the only woman present, accompanied by Boyle, Hutter, Sexton, Alex Sato (HP Account Supervisor), and Chief Creative Officer in Dallas, Texas, Michael Lovegrove.  Dunbar was stunned speechless by the CEO's repeated use and celebration of this offensive term—apropos to nothing but blatant sexual harassment.  Dunbar felt deeply offended, belittled and degraded to non-person status by TracyLocke's highest executive's use of the derogatory and gender-specific c-word.  Minutes later Dunbar had to present to a room full of the same superiors and male clients.

70.    Given her and former female employees' futile experiences reporting sexual harassment and assault by lower-level executives, Dunbar feared she would be fired if she brought this incident to light.  Neither Sexton, Hutter, Lovegrove, nor Sato reported the incident either.

**E.    Group Creative Director Brian Hutter Implies Dunbar Needs a "Facelift," Suggests Taping Her Mouth Shut, and Blocks Her Professional Advancement**

71.    Although Hutter privately praised Dunbar's performance, he publicly demeaned and humiliated her, habitually making fun of her sex in front of their team.

23

72.     In November 2017, when discussing an HP assignment that needed to be redone, Hutter stated, "I suggested calling it a 'facelift,' but Karen didn't think that was funny," implying that Dunbar would be offended by the word "facelift" because she needed one.

73.     Hutter was defensive about Dunbar's comparatively greater professional experience, including stating that "our work was always great, not just since YOU came on the team." Hutter was agitated and offended that Dunbar had the audacity to seek the promotions that she deserved.

74.     Hutter often communicated to Dunbar that, as a man and breadwinner, his career was paramount to hers. He publicly characterized Dunbar as the proverbial "nagging wife," telling a group of her male subordinates, "whatever she says, just agree with her." Hutter also complained of Dunbar's "strong opinions."

75.     In Fall 2017, in front of a large group, Dunbar offered a viewpoint for consideration to which Hutter dismissively remarked, "Can't I ever just decide something without you chiming in?"

76.     In December 2017, Hutter suggested taping Dunbar's mouth shut. In front of a team of mostly Dunbar's subordinates, he dramatically tore off two strips of tape and threatened: "I can think of something else tape is good for."

77.     Hutter and other supervisors also blocked Dunbar from professional advancement opportunities made readily available to even subordinate male colleagues. For example, from 2016 to 2018, Hutter rarely permitted Dunbar to travel to client meetings attended by less qualified and less experienced male colleagues. Dunbar alone had to obtain special permission from Hutter and Sexton to travel. In another incident, Dunbar worked long hours to create a video for the HP team, yet Hutter excluded her from the editing and production process. When

24

Dunbar asked to continue working on the video in its final stages, Hutter explained that the session was "too crowded" to permit her, even though male team members with less experience in video editing and production could participate.

**F.     TracyLocke Staff Produce and Screen Misogynistic and Homophobic Videos**

78.     Agency production personnel created certain offensive videos, apparently for internal Agency distribution and use only, but representative of the prevailing Boys Club culture at the Agency. These videos were professionally produced at the Agency, using Agency staff and resources, with scripts written by Agency personnel, and featuring on-screen appearances by Agency staff members.

79.     In one video, titled (in substance, if not verbatim) "What If Chris Viynals Ran the Agency?," an Agency employee behaves like a tyrant in the office environment, and with impunity.  At the conclusion of the video, the protagonist is seen with his feet up on a table in the common area in the TracyLocke Wilton office kitchen.  He then is shown surveying the physical attributes of various female staff members.  The video ends with the following scene:  as an attractive young woman walks past the protagonist, he slaps her squarely on the buttocks.

80.     In another video, Agency staff members engage in sophomoric commentary concerning the Agency's successful retention of the Dick's Sporting Goods account. The video features three young staff members (two male and one female) seated in the common area kitchen in the TracyLocke Wilton office and joking about securing the account.  The female member states (in substance, if not verbatim), "Working on Dick's is going to be hard," while her male colleagues chime in with statements (in substance, if not verbatim) like, "Yeah, but the more you work on Dick's the bigger it will get."  This video concludes with another Agency staff

member acting in an overly-flamboyant and stereotypically-gay manner and stating (in

substance, if not verbatim), "I can't wait to work on Dick's!"

81.     On information and belief, these videos were produced in or about 2016, shown to

Agency staff members at holiday parties, and disseminated throughout the Agency. A male

Agency employee played the videos for Dunbar in 2016.

**V.     "Brammer the Hammer" Repeatedly Ignores, Disregards and Downplays Reports of Sexual Harassment and Discrimination from Dunbar and Other Women**

82.     As a result of decades of inaction and sycophantic loyalty to male executives who

sexually harass, abuse, demean, diminish and discriminate against female subordinates, Brammer

was widely known by the nickname "Brammer the Hammer."  It was widely understood by

former and current female employees, including Plaintiff, that Brammer's No. 1 priority was to

cater to and protect male executives and not female employees who are mistreated and

victimized.

83.     It was widely understood by former and current female employees, including

Plaintiff, that complaining to HR about sexual harassment or discriminatory conduct is an

exercise in futility and, worse still, may get you demoted or fired.

84.     Dunbar embraced her role as one of the only female members in creative

leadership to challenge the Agency's misogynistic and pervasively hostile work environment.

Dunbar worked tirelessly to achieve excellence in her work and to advance professionally, and

she mentored and encouraged younger female colleagues to do the same.  Dunbar's leadership

role did not go unnoticed by male management.  In his written annual review, Hutter specifically

pointed out that "Karen has taken women on the team to Women's Conferences."

### A.      Defendants Protect and Promote Repeat Offender Curtiss Bruno

85.      Younger female colleagues confided in Dunbar about past experiences of sexual harassment, assault, and discrimination at the Agency.  For example, Dunbar learned from her subordinates that in April 2014, Group Account Director Curtiss Bruno sexually assaulted a female subordinate, while a male co-worker looked on.  Approaching the female employee from behind, Bruno pressed up against her, felt up her hips and torso, and fondled her breasts.  When the violated female employee reported the assault to Brammer, she mentioned that this was not the first serious allegation of sexual misconduct against Bruno, but failed to take appropriate remedial action to hold Bruno accountable for his outrageous and abusive misconduct.

86.      Dunbar also had first-hand experience with Bruno's harassment.  One day, while Dunbar was in the kitchen area, Bruno abruptly stated to her, "You're looking hot, beautiful and leggy this morning."

87.      Bruno's reputation for sexual misconduct in the workplace was widely known by former and current female employees.  During the Agency's perfunctory and ineffective anti-discrimination training overseen by Brammer, when the subject of sexual harassment came up, female employees were known by Brammer to refer to Curtiss Bruno out loud.  Despite Bruno's Agency-wide reputation as a repeat offender the Agency retained and promoted Bruno to one of the highest executive management positions at the Agency.

88.      In contrast, the subordinate female employee Bruno sexually assaulted left the Agency, largely because she could not bear being in the presence of the man who violated her but was not held accountable and never apologized to her.  As a result of Bruno's unlawful and unrepentant attack, she has suffered irreparable harm, including severe anxiety and post-

traumatic stress.  During the former employee's exit interview, Brammer confirmed that a male co-worker had corroborated the incident she reported.

89.     Based on her experience and that of numerous female co-workers who had confided in her, Dunbar became quite vocal about being harassed and disempowered and about the treatment of the Agency's female staff members generally. Dunbar often had women come to see her, ask to shut the door, and share a story of mistreatment or abuse.  Dunbar shared many of these reports with supervisory Agency personnel:  She made complaints to Brian Hutter (Group Creative Director and her immediate supervisor); Jim Sexton (Partner and Account Director); Nicole Nieporent (Chief of Staff); and others.  Dunbar also specifically complained about her abusive subordinate (Matt Cappiello), at one point telling Brammer, "You are subjecting me to a hostile work environment because you won't remove him."  Neither Brammer nor any other Agency personnel responded to these complaints.

90.     Dunbar asked that the Agency replace its perfunctory and ineffective sexual harassment and discrimination prevention training with a more effective program.  Dunbar also reported sexual harassment and discrimination not only to Hutter, but to higher-up supervisors Sexton and Camarota, as well as to Brammer.  Although the Agency and Brammer had the power to do so, they failed to address and rectify Dunbar's complaints.  While the Agency did not update sexual harassment and discrimination prevention training, it did make a movie to advertise and profit from the Agency's purported commitment to diversity and sex equality, produced by employee Kristin Barnard, who warned Dunbar the movie would make her cry "not because it's well done, but because it's bulls—t."

**B.     Defendants Unconscionably Disclaim Responsibility and Do Nothing to Stop Repeated Incidents of Egregious Sexual Harassment by IT Engineer "Creepy Kevin"**

91.     The Agency's longtime pattern and practice of permitting and facilitating an unchecked and out-of-control sexually-hostile work environment was exemplified by its unconscionable failure to take immediate action to stop egregious and repeated incidents of sexual harassment and misconduct perpetrated by a male IT engineer for years against multiple female employees working in the Agency's Connecticut office.  This IT engineer's offensive, outrageous and patently unlawful sexual harassment and stalking-like behavior toward young female employees was so persistent and pervasive that he was widely-known by former and current employees, including Plaintiff, as "Creepy Kevin."

92.     Based on information and belief, "Creepy Kevin" is a middle-aged male with a substantially larger frame than the younger female employees he preyed upon.  Based on information and belief, "Creepy Kevin's" unlawful, offensive and frightening sexually inappropriate conduct included:

- making inappropriate and offensive comments to female employees about their appearance, clothing, mood and social life;

- sending a former female employee intimate, offensive and unwanted hand-written notes saying: "Hey Beautiful," "Thinking about you" and "Can't stop thinking about you";

- invading a former female employee's personal space by brushing up against her from behind to whisper inappropriate comments in her ear;

- sneaking up behind and positioning his large frame so close to a former female employee that she "could feel him on her";

- exhibiting stalker-like behavior by leaving unwanted "gifts" on a former female employee's desk despite her telling him to stop doing this.

93.    Based on information and belief, female employees who reported and sought help from HR to stop "Creepy Kevin's" extremely offensive and abusive misconduct were told by Brammer and Recruiting Coordinator Dana Donia that the offending IT Engineer is employed by an "outside company" and "not in our jurisdiction."  Simply put, Brammer, Donia, and the Agency knowingly, deliberately and unconscionably refused to take any action to protect and prevent female employees from being subjected to "Creepy Kevin's" patently unlawful sexual harassment and abusive misconduct.

## VI.    In Retaliation for Opposing the Agency's Unlawful Sexual Harassment and Discriminatory Practices, Dunbar Was Demoted

94.    Following her "exceptional" March 2017 performance review, Dunbar actively pursued a promotion to Group Creative Director, a position she already had held for years at another premium agency.  This included outworking and outperforming most of her male colleagues, volunteering to work on new business and client pitches, and doing what it took to prove herself professionally.

95.    In July 2017, Dunbar expressed her interest in promotion to Group Creative Director to Executive Creative Director Phil Camarota.  Camarota was about 15 years younger than Dunbar and had substantially less advertising industry experience.  In fact, TracyLocke was the only place Camarota had ever worked.  In the advertising industry, it is highly unusual for someone with Camarota's limited experience at one agency in Connecticut to be promoted to Executive Creative Director, the highest creative leadership position.

96.     In addition to having performed exceptionally well at the Agency, Dunbar explained to Camarota that she had been a Vice-President and Group Creative Director at the New York agency Kirshenbaum & Bond, and that she could help grow TracyLocke's business by applying her management skills at a higher level.  Dunbar expressly told Camarota that she

30

welcomed the opportunity to help pitch and take on more of the business opportunities from which she essentially had been barred in the past.

97.      Dunbar sent follow-up emails to Camarota for the next six months, reaffirming her desire to help with pitches and to take on new business.  Nevertheless, with one exception, every opportunity to work on pitches and new business during this time was funneled to men.

98.      After expressing her desire to be promoted to Group Creative Director, Dunbar organized groups of eight to 12 female colleagues to attend conferences in New York City sponsored by She Runs It, an organization that encourages and promotes women's roles in the advertising, marketing, media, and tech industries.  Dunbar advised Hutter and Camarota of her active recruiting of female Agency colleagues to attend these conferences. Consistent with the Agency's Boys Club culture, in response to these efforts, male senior management members increased their retaliatory actions against Dunbar.

99.      In January 2018, Dunbar scheduled a meeting with Camarota to further discuss her promotion to Group Creative Director.  At this meeting, Camarota stunned her with the information that, rather than promoting Dunbar, he was transferring a younger, less-qualified, and less-experienced male Creative Director, Chris DeSalvo, to the HP team and diverting many of Dunbar's projects and responsibilities to him—effectively demoting Dunbar.

100.     Camarota called this a team "restructuring," and told Dunbar "not to think of it as a demotion."  When Dunbar stated her displeasure with the demotion, he told her that he could just throw her out if she didn't like the change.  Camarota aborted any further discussion of Dunbar's possible promotion to Group Creative Director.

101.     Male management informed all men on the HP team, including Dunbar's male subordinates, of the team's "restructuring" before they informed Dunbar.  And, true to form, the "Band of Brothers" kept the information to itself, so that Dunbar—the team member most affected by the change—was the last to know.

102.     Rather than promote her, the Agency and Brammer began a campaign to marginalize and criticize Dunbar, a "difficult woman"—in Hutter's words—who bravely reported sexual harassment and discrimination and seriously pursued equal treatment and well-deserved promotions for herself and for younger female colleagues.

103.     When Dunbar continued to question the team's punitive restructuring, Hutter eventually exploded in anger and challenged her to a "confrontation," while Camarota dismissed her, telling her to "go home" to think about whether she was "on board."

104.     In February 2018, Dunbar joined with other women in the Agency's Connecticut office to launch "Feminist Fridays," a platform initiated by female co-workers to raise awareness about sexual harassment and discrimination at the Agency, and more effectively advocate for equal pay and equal opportunity for females at the Agency with regard to professional development and promotions.

105.     On March 8, 2018, in recognition of International Women's Day, the Agency prepared "TL Props to Her" cards for display on the office PROPS Wall.  Dunbar received PROPS from at least five female co-workers, including several women on the HP team, each of whom expressed their gratitude to Dunbar for "breaking the glass ceiling"; "being a great boss"; "being a strong and confident female role model"; "being a constant source of inspiration for the women of HP!"; "showing that there's always a seat at the table!"; and "setting a great creative example."

106.    Male leadership expressed disdain for International Women's Day.  Female subordinates overheard Sexton crowing to subordinate male HP team members "what a joke all this women in leadership is"; "there are no women in leadership except maybe two"; and "it's not a good time to be a white male."

107.    On or about March 8, 2018, Dunbar sought support from Hutter, who earlier that day had recognized her excellent work with an office "PROPS" card "for rockn' out a ton of great work on a daily basis and guiding the team to greatness."  Hutter exploded in anger when Dunbar met him in his office to ask for a clear delineation of roles between her and second team Creative Director, Chris DeSalvo.  Hutter verbally abused and physically intimidated her.  He asked how she dared to question her role, suddenly moving closer to physically engage Dunbar.  Towering over her by more than a foot, Hutter aggressively raised his arms while rancorously declaring, "Now you and I are going to have a confrontation."

## VII.    In Retaliation for Asserting Her Rights and Engaging in Protected Activity, Defendants Fired Dunbar Without Cause

108.    Three weeks later, the Agency terminated Dunbar in retaliation for making sexual harassment and discrimination complaints to her supervisors and HR, for requesting and pursuing equal treatment, and for her equality advocacy.

109.    On March 27, 2018, Dunbar unexpectedly was summoned to Camarota's office.  Camarota and Hutter were waiting there with Brammer, who had orchestrated the meeting and flown in from Texas to fire Dunbar in person.  Without any notice or advance warning, Brammer informed Dunbar that she was being terminated effective immediately and directed her to gather her personal things and leave the building under escort, without speaking to anyone.

110.    When Dunbar asked why the Agency was firing her, Brammer first explained that Dunbar had been "disloyal" for updating her professional portfolio.  However, when pressed,

33

Brammer acknowledged that many employees regularly work on their portfolios, that there is no prohibition against doing so, and that Dunbar never worked on her portfolio during business hours.  Essentially, Brammer admitted that her portfolio justification was pretextual.  Moreover, Dunbar has personal knowledge that male employees in creative leadership and supervisory positions have asked female subordinates to put together portfolios for them without any adverse action being taken against them.

111.    Brammer next claimed that Dunbar had been "disloyal" by exploring other employment opportunities while employed by the Agency.  However, the Agency had not only retained, but pandered to, male employees under similar circumstances.  For example, Ryan Swierczek and Basil Inferrera both openly expressed unhappiness with their jobs and actively and openly sought alternative employment.  In response, Defendants took affirmative action to appease the men's complaints and financially incentivize them to remain at the Agency.

112.    An hour or so after being told to leave the termination meeting, Dunbar called Brammer and stated that she wanted to clean out her office the following morning. She also told Brammer that she would be hiring a lawyer and that the next contact from Dunbar would come through her attorney.

113.    Soon after Dunbar's abrupt firing, Camarota met with a junior female employee— the co-founder of "Feminist Fridays"—to assure her that the Agency would not retaliate against her for vocally challenging gender inequality, tacitly implying that the Agency had, in fact, retaliated against Dunbar for mentoring and supporting the initiative and advocating for equality and a respectful, harassment-free workplace.

114.    The only reasonable explanations for the shocking and abrupt downturn in Dunbar's otherwise "Exceptional" career at TracyLocke are: (1) gender discrimination; and (2)

retaliation for Dunbar's pursuit of equal treatment and equality activism, including her efforts to bring incidents of sexual harassment and discrimination to light.  This clearly was the view of Dunbar's former female co-workers, who (within a week of her termination) presented her with a collection of notes thanking Dunbar for, *inter alia*, being "an empowered and empowering leader"; serving as "an advocate that we all needed"; and for paving the way for other women in the industry:  "Glass ceilings are hard to break and having you on the top floor with a hammer is an inspiration."

115.     Moreover, the Agency did not follow protocol when firing Dunbar without warning.  Dunbar had no prior notice that she may lose her job.  In stark contrast, as discussed in Section V.A, *supra*, ¶¶ 57-62, the Agency jumped through hoops for months to retain a poor-performing male employee, known and feared office-wide for his uncontrollable hostility toward women, and even gave him the benefit of a special "behavior contract."   Dunbar—a high-performing female Creative Director—received no such preferential treatment.  Far from it. Dunbar was fired by ambush and immediately escorted from the building.

116.     Based on information and belief, Brammer took great pride in her lead role in orchestrating Dunbar's ambush termination, boasting that it was a career-enhancing feather in her cap.

**VIII.    Despite Notice Of Dunbar's EEOC and CHRO Complaints, the Agency Arrogantly Blew Off Federal and State Enforcement Authorities**

117.     Following Dunbar's discharge from the Agency, she contacted and retained Kerrie L. Campbell, a member of The #TIMES UP Legal Network for Gender Equity, to represent her with respect to her claims of discrimination with the U.S. Equal Opportunity Employment Commission ("EEOC") and Connecticut Commission on Human Rights and Opportunities ("CHRO").

118.     In April 2018, Campbell invited Omnicom and TracyLocke to participate in confidential settlement negotiations to attempt to resolve Dunbar's claims.  On July 30, 2018, Campbell sent Defendants' counsel a 34-page letter presenting and substantiating Dunbar's claims.  The letter informed Defendants that, in the absence of an acceptable negotiated resolution, Dunbar would file a Charge of Discrimination with EEOC and CHRO.

119.     Defendants rebuffed Plaintiff's good faith efforts to engage in pre-litigation negotiations, declined Plaintiff's invitation to participate in pre-litigation mediation, and indicated that filing a Charge of Discrimination and/or lawsuit would not change Defendants' position.

120.     On September 13, 2018, Plaintiff filed a dual charge of discrimination against Defendants TracyLocke and Omnicom with CHRO, complaint numbers 1920097 and 1920098, and EEOC, complaint numbers 16A-2018-01854 and 16A-2018-01855.

121.     Plaintiff's counsel promptly provided notice of these filings—and every filing with these agencies—via email to Defendants' counsel, Davis & Gilbert partner Daniel Feinstein.

122.     Despite having actual notice of the proceedings and all of Dunbar's submissions, Defendants completely disregarded CHRO authority.  The Agency failed to answer Dunbar's Charge of Discrimination and failed to respond to CHRO's detailed requests for information and documents served on them by CHRO in October 2018 and denied having received CHRO's requests.

123.    On January 23, 2019, CHRO Southwest Region Manager, Jamie Rubin, requested that a Default Order be entered against Respondents TracyLocke and Omnicom for failure to answer Dunbar's Complaint and failure to respond to CHRO's requests for information and documents.

124.    The Agency's blatant disregard for CHRO's authority and procedures cannot plausibly be attributed to a lack of notice.  In addition to CHRO communications served on Defendants, as a professional courtesy, Plaintiff's counsel provided Davis & Gilbert partner Danial Feinstein copies of all documents Dunbar submitted to CHRO.

## IX.    After Receiving Unambiguous Notice of Dunbar's Claims, Defendants Destroy Evidence in Violation of the Agency's Document Retention and Litigation Hold Policies

125.    The Agency's Employee Handbook states that the "Omnicom Code of Business Conduct" applies to all directors, officers and employees of Omnicom Group Inc. and its majority-owned subsidiaries (collectively, the "Company")" [p. 80].

126.    The Handbook is replete with provisions stressing the "particular importance" of the Agency's "legal duty to retain and preserve materials that might be requested in a pending or anticipated legal proceeding, audit or investigation."  Under the caption, "Record Retention," the Handbook states:

- "Never destroy a record that is required to be maintained by law as it may result in serious consequences for both you and the Company.  It is imperative that you take all necessary steps to ensure that records required to be maintained by law or for business purposes are maintained and not destroyed."  [p. 19];

- "Electronic records, which includes emails that constitute records, should be retained according to this policy.  Failure to retain emails that are records can have serious consequences."  [p.20];

37

- "When the General Counsel becomes aware that a legal proceeding, audit or investigation is pending or anticipated, he/she will promptly notify the appropriate employees and direct that any records pertaining to that proceeding, audit or investigation be labeled for retention until further notice."  [p. 20];

- If you "become aware that the Company is the subject of any pending or anticipated legal proceeding, audit or investigation with respect to which you have pertinent records, you must preserve those records by immediately ceasing any alteration, deletion or destruction of such records even if under the current retention schedule, or otherwise under this policy, you would be authorized to do so."  [p. 20];

- "This obligation is not limited to financial documents and associated records, and includes many other types of records, including those that you may have in your files (both hard copy and email and other electronic files)."  [p. 20].

127.   Under the caption "Omnicom Document Retention Guidelines in the event of Investigation/Litigation," the Handbook states:

- "If you become aware that the Company (or another Omnicom entity with respect to which you may have relevant records) is the subject of any pending or anticipated U.S. government investigation or litigation, you must cease immediately any alteration, deletion or destruction of records including electronic records, related to the subject matter of such investigation or litigation."  [p. 83];

- "Employees, contractors, temporary employees or agents who knowingly and willfully violate this policy will be considered to have violated the Omnicom Code of Business Conduct."  [p.83].

128.   The Handbook reiterates that "[e]very employee and individual acting on behalf of the Company is responsible for compliance with this policy.  If as an employee, you have any questions on responsibility you should raise your concerns with the Head of the Office or Human Resources."  [p. 87].  CEO Hugh Boyle, in the Agency's Dallas, Texas office, is identified as "Head of the Office" and Brammer is identified as "Human Resources."  [p.88].

129.     As the designated HR contact, Brammer was fully aware of and explicitly required to comply with all Agency document retention and litigation hold policies.  Both Brammer and the Agency violated their respective duties and obligations to comply with policies specifically put in place to prevent the improper alteration, deletion, or destruction of evidence.

130.     During the Agency's March 27, 2018 ambush termination meeting, Dunbar notified Brammer and the Agency that she was contacting legal counsel regarding her unjustified and retaliatory termination.  In a March 27, 2018 email, Brammer confirmed in writing that Dunbar had indicated she had been subject to gender-based discriminatory conduct at TracyLocke.

131.     Despite unambiguous notice of potential litigation, and in egregious violation of the Agency's policies detailed above, the Agency failed to immediately issue a litigation hold and knowingly and intentionally destroyed Plaintiff's entire email account in a manner intended to ensure that information and evidence relating to the Agency's and Brammer's misconduct and Dunbar's claims would be irretrievable.

132.     In further violation of the Agency's litigation hold and document retention requirements, the Agency knowingly and intentionally "wiped" Dunbar's company-issued laptop clean in a manner intended to ensure that information and evidence relating to the Agency's and Brammer's misconduct and Dunbar's claims would be irretrievable by forensic examination or otherwise.

## X.     Defendants Publicly Disparage Dunbar to Damage Her Professional Reputation and Deter Other Women from Asserting Their Rights

133.     After knowingly destroying evidence pertaining to Dunbar's claims, the Agency and Brammer maliciously cooked up a false and defamatory *per se* statement publicly accusing Dunbar of bringing false claims against the Agency.

134.    In December 2019, with knowledge of its falsity and/or in reckless disregard for the truth, Brammer made a false and defamatory *per se* official statement to the *New York Times* ("NYT") for the purpose of disparaging Plaintiff's professional integrity and character.  In a widely-disseminated article titled, "#MeToo Clashes with 'Bro Culture' at Ad Agencies," Brammer asserts *as fact* the following statement wrongly accusing Dunbar of making false claims against the Agency:  "Teresa Brammer, the agency's chief human resources officer, said that Ms. Dunbar's accusations were found by external investigators to be without merit, adding that 'there is no higher priority than creating a safe, fair and equitable workplace for our associates.'"[11]

135.    Brammer and the Agency knew at the time Brammer's statement was published that it was false, highly-misleading and injurious to Dunbar's professional reputation and business, as Plaintiff has provided Defendants and detailed in her Complaint fulsome facts, information and legal authorities substantiating her claims.

136.    The quoted defamatory *per se* statement was intended by each of the Agency Defendants and Brammer to injure Plaintiff's reputation, character and business and to deter other women employed by the Agency from speaking out and asserting their rights.

137.    As a consequence of the Agency Defendants' and Brammer's misconduct, Dunbar has been injured in her good name and reputation as a creative director and group creative director in the advertising industry; has suffered economic harm and severe emotional distress; and has been exposed to public shame, embarrassment, humiliation and ridicule, all of which has damaged Plaintiff's career and future employability at the peak of her career in the industry.

---

[11] https://www.nytimes.com/2019/12/22/business/media/ad-industry-sexi.html.

**XI.     Defendants' Engage in Ongoing Intimidation Tactics and Unlawfully Interfere with Female Employee's Rights**

138.     On or about January 2, 2020, Defendants sent an email to Plaintiff's former female co-worker and former employee of Defendants, asking her to meet with Defendants' counsel to discuss Plaintiff's Complaint "alleging discrimination and harassment during her employment at the agency."

139.     In their January 2, 2020 email, Defendants and Brammer stress that "these meetings [referring to meetings with other female co-workers of Plaintiff] are very important." In an unlawful attempt to interfere with female employees' rights to openly discuss Defendants' sexual harassment and discriminatory conduct with co-workers—and in a deliberate attempt to silence female employees from engaging in protected activity—Defendants and Brammer explicitly instructed Plaintiff's former co-worker to "refrain from discussing these meetings with your colleagues."

## CLAIMS FOR RELIEF

### COUNT ONE
### (Title VII - Hostile Work Environment,
### Against Defendants Omnicom and TracyLocke)

140.     Dunbar repeats and realleges Paragraphs 1 through 139 as if fully set forth herein.

141.     Defendants Omnicom and TracyLocke, each one an employer within the meaning of Title VII, discriminated against Dunbar in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), by intentionally creating and facilitating a work environment severely and pervasively hostile to women, in which male supervisors and leadership repeatedly and intentionally sexually harassed her and other women in a manner that intimidated her and unreasonably interfered with her work.

41

142.    During the course of her employment, Dunbar endured, *inter alia*, repeated incidents of sex-based verbal abuse and intimidation; harmful, offensive, and unwanted physical touching; humiliating, demeaning, and lewd sex-based comments; and indecent propositions.

143.    Omnicom and TracyLocke failed to prevent, respond to, adequately investigate, or appropriately resolve this sexual harassment.

144.    Omnicom and TracyLocke's workplace was permeated with gender-based discriminatory intimidation, ridicule, and insult that was sufficiently severe and pervasive to create an abusive working environment and to alter the conditions of Dunbar's employment.

145.    Omnicom and TracyLocke not only were aware of the objectionable conduct, they affirmatively promoted the objectionable conduct.

146.    The discriminatory intimidation, ridicule, and insult Dunbar experienced was based on her gender; occurred with great frequency; was severe; was physically threatening and/or humiliating; involved verbal, written, visual, and physical manifestations; and unreasonably interfered with Dunbar's work performance.

147.    By reason of the pattern, practice and continuous nature of the conduct of Omnicom and TracyLocke which persisted throughout Dunbar's employment, Dunbar is entitled to application of the continuing violations doctrine to all violations alleged herein.

148.    The conduct of Omnicom and TracyLocke has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of Dunbar's rights, entitling her to punitive damages.

149.    By reason of the conduct of Omnicom and TracyLocke alleged in this Complaint, Dunbar has suffered and will continue to suffer harm, including:  lost earnings, lost benefits, and other financial loss—including interest, impairment to her name and reputation, humiliation,

emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

150.    By reason of the sexual harassment of Omnicom and TracyLocke, Dunbar is entitled to all legal and equitable remedies available for violations of Title VII, including punitive damages.

151.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT TWO
### (CFEPA - Hostile Work Environment,
### Against Defendants Omnicom and TracyLocke)

152.    Dunbar repeats and realleges Paragraphs 1 through 151 as if fully set forth herein.

153.    Omnicom and TracyLocke, each one an employer within the meaning of the Connecticut Fair Employment Practices Act ("CFEPA"), discriminated against Dunbar in violation of the CFEPA, by intentionally creating and facilitating a work environment severely and pervasively hostile and offensive to women, in which male supervisors and leadership repeatedly sexually harassed Dunbar with the purpose and effect of intimidating her and substantially interfering with her work performance.

154.    During the course of her employment, Dunbar endured, *inter alia*, repeated incidents of sex-based verbal abuse and intimidation; harmful, offensive, and unwanted physical touching; offensive, humiliating, demeaning, and lewd sex-based comments; and indecent propositions.

155.    Omnicom and TracyLocke failed to prevent, respond to, adequately investigate, or appropriately resolve this sexual harassment.

156.    By reason of the pattern, practice and continuous nature of the conduct of

Omnicom and TracyLocke, which persisted throughout the employment of Dunbar, Dunbar is

entitled to application of the continuing violations doctrine to all violations alleged herein.

157.    By reason of the conduct of Omnicom and TracyLocke alleged in this Complaint,

Dunbar has suffered and will continue to suffer harm, including:  lost earnings, lost benefits, and

other financial loss—including interest, impairment to her name and reputation, humiliation,

emotional and physical distress, physical injuries and illness, mental anguish, and other non-

economic damages.

158.    The conduct of Omnicom and TracyLocke entitles Dunbar to all legal and

equitable remedies available for violations of CFEPA, including uncapped compensatory

damages and other compensation under Conn. Gen. Stat. § 46a-104.

159.    Attorneys' fees and costs should be awarded under Conn. Gen. Stat. § 46a-104.

### COUNT THREE
### (Title VII - Retaliation, Against Defendants Omnicom and TracyLocke)

160.    Dunbar repeats and realleges Paragraphs 1 through 159 as if fully set forth herein.

161.    Dunbar engaged in the protected activity of opposing practices violative of Title

VII, including complaining to the Agency, her supervisors and HR about sex discrimination,

discriminatory compensation, and sexual harassment; and actively promoting sex equality for

herself and other female employees of the Agency.

162.    Omnicom and TracyLocke terminated Dunbar's employment in retaliation for her

complaining to supervisors and HR about sex discrimination, discriminatory compensation, and

sexual harassment; and actively promoting gender equality for herself and other female

employees of the Agency.  Omnicom and TracyLocke also retaliated against Dunbar by, *inter*

*alia*, constructively demoting her under the guise of a team "restructuring" and diverting many of

her projects and responsibilities to a younger, less experienced and less qualified man; refusing her a promotion from Creative Director to Group Creative Director, a position she was more qualified to hold than many existing GCDs (nearly all of whom were male); and denying her vital employment opportunities to further prove her capability as, and effectively work toward a promotion to, GCD.

163.    The retaliatory acts of Omnicom and TracyLocke against Dunbar were a direct and proximate result of her protected activities.

164.    A reasonable employee would find the retaliatory acts of Omnicom and TracyLocke materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.  The retaliatory acts of Omnicom and TracyLocke materially and detrimentally affected the terms, conditions and privileges of Dunbar's employment, deprived her of vital employment opportunities, otherwise adversely affected her status as an employee, and ultimately ended her employment.

165.    The conduct of Omnicom and TracyLocke has been intentional, deliberate, willful, malicious, reckless, and in callous disregard for Dunbar's rights, entitling her to punitive damages.

166.    By reason of the conduct of Omnicom and TracyLocke alleged in this Complaint, Dunbar has suffered and will continue to suffer economic and non-economic losses, including lost earnings, lost benefits, impairment to her name and reputation, humiliation, emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

167.    By reason of the retaliation of Omnicom and TracyLocke, Dunbar is entitled to all legal and equitable remedies available for violations of Title VII, including punitive damages.

168.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT FOUR**
**(CFEPA – Retaliation, Against Defendants Omnicom and TracyLocke)**

169.    Dunbar repeats and realleges Paragraphs 1 through 168 as if fully set forth herein.

170.    Dunbar engaged in the protected activity of opposing practices violative of CFEPA, including complaining to supervisors and HR about sex discrimination, discriminatory compensation, and sexual harassment, and actively promoting gender equality for herself and other female employees of the Agency.

171.    Defendants Omnicom and TracyLocke, each one an employer within the meaning of CFEPA, terminated Dunbar's employment in retaliation for complaining to supervisors and HR about sex discrimination, discriminatory compensation, and sexual harassment; and actively promoting gender equality for herself and other female employees of the Agency.  Omnicom and TracyLocke also retaliated against Dunbar by, *inter alia*,  constructively demoting her under the guise of a team "restructuring" and diverting many of her projects and responsibilities to a younger, less experienced, and less qualified man; refusing her a promotion from Creative Director to Group Creative Director, a position she was more qualified to hold than many existing GCDs (nearly all of whom were male); and denying her vital employment opportunities to further prove her capability as, and effectively work toward a promotion to, GCD.

172.    The retaliatory acts of Omnicom and TracyLocke against Dunbar were a direct and proximate result of her protected activities.

173.    A reasonable employee would find the retaliatory acts of Omnicom and TracyLocke materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.  The retaliatory acts of Omnicom and TracyLocke materially and detrimentally affected the terms, conditions, and privileges of Dunbar's

employment, deprived her of vital employment opportunities, otherwise adversely affected her status as an employee, and ultimately ended her employment.

174.     By reason of the conduct of Omnicom and TracyLocke alleged in this Complaint, Dunbar has suffered and will continue to suffer economic and non-economic losses, including lost earnings, lost benefits, impairment to her name and reputation, humiliation, emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

175.     The conduct of Omnicom and TracyLocke entitles Dunbar to all legal and equitable remedies available for violations of CFEPA, including uncapped compensatory damages and other compensation under Conn. Gen. Stat. § 46a-104.

176.     Attorneys' fees and costs should be awarded under Conn. Gen. Stat. § 46a-104.

## COUNT FIVE
### (Title VII – Discrimination, Against Defendants Omnicom and TracyLocke)

177.     Dunbar repeats and realleges Paragraphs 1 through 176 as if fully set forth herein.

178.     Defendants Omnicom and TracyLocke, each one an employer within the meaning of Title VII, wrongfully discharged Dunbar in retaliation for engaging in the protected activity of opposing practices violative of Title VII, including complaining to supervisors and HR about sex discrimination, discriminatory compensation, and sexual harassment, and actively promoting gender equality for herself and other female employees of the Agency.  Omnicom and TracyLocke effectively replaced Dunbar with a younger, less experienced, and less qualified man.

179.     In contrast to Dunbar's abrupt and unjustified discharge, Omnicom and TracyLocke took months to terminate an objectively erratic and dangerous man, Matt Cappiello, after he had assaulted numerous female employees and poorly performed his job.  Omnicom and

TracyLocke even took pains to write him a special "behavior contract," in a failed attempt to remedy the situation, before ultimately terminating him.

180.    The wrongful discharge of Dunbar by Omnicom and TracyLocke was a direct and proximate result of her protected activities.

181.    The conduct of Omnicom and TracyLocke has been intentional, deliberate, willful, malicious, reckless, and in callous disregard for Dunbar's rights, entitling her to punitive damages.

182.    By reason of the conduct by Omnicom and TracyLocke alleged in this Complaint, Dunbar has suffered and will continue to suffer economic and non-economic losses, including lost earnings, lost benefits, impairment to her name and reputation, humiliation, emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

183.    By reason of the retaliatory discharge by Omnicom and TracyLocke, Dunbar is entitled to all legal and equitable remedies available for violations of Title VII, including punitive damages.

184.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT SIX
### (CFEPA – Discrimination, Against Defendants Omnicom and TracyLocke)

185.    Dunbar repeats and realleges Paragraphs 1 through 192 as if fully set forth herein.

186.    Defendants Omnicom and TracyLocke, each one an employer within the meaning of CFEPA, wrongfully discharged Dunbar in retaliation for engaging in the protected activity of opposing practices violative of CFEPA, including complaining to supervisors and HR about sex discrimination, discriminatory compensation, and sexual harassment; and actively promoting gender equality for herself and other female employees of the Agency.  Omnicom and TracyLocke effectively replaced her with a younger, less experienced, and less qualified man.

187.     In contrast to Dunbar's abrupt and unjustified discharge, Omnicom and TracyLocke took months to terminate an objectively erratic and dangerous man, Matt Cappiello, after he had assaulted numerous female employees and poorly performed his job.  Omnicom and TracyLocke even took pains to write him a special "behavior contract," in a failed attempt to remedy the situation, before ultimately terminating him.

188.     The wrongful discharge of Dunbar by Omnicom and TracyLocke was a direct and proximate result of her protected activities.

189.     By reason of the conduct of Omnicom and TracyLocke alleged in this Complaint, Dunbar has suffered and will continue to suffer economic and non-economic losses, including lost earnings, lost benefits, impairment to her name and reputation, humiliation, emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

190.     The conduct of Omnicom and TracyLocke entitles Dunbar to all legal and equitable remedies available for violations of CFEPA, including uncapped compensatory damages and other compensation under Conn. Gen. Stat. § 46a-104.

191.     Attorneys' fees and costs should be awarded under Conn. Gen. Stat. § 46a-104.

## COUNT SEVEN
### (Breach of Contract, Against All Agency Defendants)

192.     Dunbar repeats and realleges Paragraphs 1 through 191 as if fully set forth herein.

193.     The Agency provided Dunbar with an Employee Handbook that identified Defendants' "Sexual Harassment" and "Harassment" policies.  The Agency stated that sexual harassment, other unlawful harassment, and retaliation against employees who report any kind of harassment, "will not be tolerated."  The Agency also promised to "take[] allegations of sexual harassment seriously" and "respond promptly to complaints of sexual harassment."  The Agency states in its "Implementation and Enforcement" provision that employees "should feel free to

49

discuss [harassment] with [their] supervisor, the financial manager for [their] unit or Omnicom's compliance office."  The Agency reiterated that "[a]ll reports of possible violations about which management becomes aware will be promptly considered. We will not punish any employee or representative for making any report in good faith."

194.    Furthermore, Omnicom's website deceptively advertises that the company "embraces inclusion and diversity" by "creat[ing] structures within our organizations and continually support[ing] inside and outside initiatives to promote diversity and inclusion." Under subtitle "Omniwomen," the website further advertises that "women's professional progression is not a women's issue but a business imperative," and explains the Agency's deep desire for "diverse and inclusive management" and "an inclusive management."

195.    Provision of a workplace in which sexual harassment and harassment generally is "not tolerated"; complaints of harassment are promptly investigated and addressed and do not serve as the basis for retaliation; and "diversity," "inclusion," and "women's professional progression" are embraced, and that evidence will be preserved, is part of the representations that the Agency makes to its potential and actual employees, including Dunbar, in exchange for their time and talent.

196.    The Agency has materially breached its promises and representations, on which Dunbar detrimentally relied when deciding whether to accept and to continue employment with the Agency.  Specifically, the Agency failed to implement and enforce its discrimination and harassment policies and to provide female employees with an environment embracing of "inclusion and diversity."  In stark contrast to the claims on its website, the Agency did not make "women's professional progression" a "business imperative," but rather, deprived women of

equal opportunity for advancement and embraces and facilitates a severely and pervasively

hostile work environment that exposed them to rampant sexual harassment.

197.   Moreover, the Agency systematically and intentionally failed to take prompt

action to address or correct harassment and discrimination or to preserve evidence.  Female

employees, including Dunbar, did not "feel free" to bring their concerns to their supervisors or

Omnicom's "compliance officer."  When they did, their complaints were usually ignored except

to the extent that they served as a basis for unlawful retaliation after her termination, despite

being on notice of pending litigation, the Agency purposefully destroyed evidence.

198.   The promises of the Agency and Dunbar's acceptance of same and employment

formed a contract which the Agency breached by failing to act in accordance with its Handbook

and the law. As a direct and proximate result of the Agency's contractual breach, Dunbar has

been damaged in an amount to be determined at trial.

199.   By reason of the Agency's conduct alleged in this Complaint, Dunbar has

suffered and will continue to suffer economic and non-economic losses, including lost earnings,

lost benefits, impairment to her name and reputation, humiliation, emotional and physical

distress, physical injuries and illness, mental anguish, and other non-economic damages.

200.   The Agency willfully breached its contract with Dunbar, intending for her to rely

on the Agency's promises while never intending to enforce its sexual harassment and

discrimination policies, to "embrace and include" women, or to make women's advancement (or

equality) a "business imperative," therefore entitling Dunbar to punitive damages.

201.   The Agency's breach of contract therefore entitles Dunbar to compensatory,

expectation, consequential and punitive damages.

**COUNT EIGHT**
**(Promissory Estoppel, Against All Agency Defendants**

202.    Dunbar repeats and realleges Paragraphs 1 through 199 of Count Seven as if fully

set forth herein.

203.    Based on the clear and definite promises and assurances made to Dunbar by the

Agency set forth in Paragraphs 38 through 44, 125 through 128, and 193 through 195, above,

Dunbar agreed to accept employment and to continue to work for the Agency.

204.    The representations, promises, and assurances made to Dunbar by the Agency

were clear, definite, and made for the specific purpose of inducing Dunbar to accept the position

offered to her, and to forego other employment opportunities.

205.    Dunbar reasonably relied on the representations, promises, and assurances made

by the Agency in accepting employment with the Agency.

206.    As a result of the Agency's conduct, Dunbar has suffered and will continue to

suffer past and future economic, physical, and emotional harm.

**COUNT NINE**
**(Negligent Misrepresentation, Against All Agency Defendants)**

207.    Dunbar repeats and realleges Paragraphs 1 through 199 of Count Seven as if fully

set forth herein.

208.    The factual representations made to Dunbar by the Agency referenced in Paragraph

203, above, were false, were made in the course of business, and were made by the Agency without

exercise of reasonable care and competence in obtaining or communicating the information

contained therein.

209.    The Agency knew or should have known that the above representations were false.

210.     Dunbar reasonably relied on these false factual representations in the conduct of her activities and in making business and employment decisions, as a result of which Dunbar sustained economic harm.

## COUNT TEN
### (Libel *Per Se*, Against All Agency Defendants and Brammer)

211.     Dunbar repeats and realleges Paragraphs 1 through 210 of Count Nine as if fully set forth herein.

212.     In December 2019, with knowledge of its falsity and/or with reckless disregard for its truth, Brammer and the Agency Defendants made a non-privileged, defamatory *per se* public statement widely published by The New York Times, charging Plaintiff with improper conduct impugning her integrity in her profession and business and intentionally damaging her professional reputation.

213.     In doing so, the Agency and Brammer intended to cause injury to Dunbar in her profession and business.

214.     By reason of the Agency's and Brammer's conduct alleged in this Complaint, Dunbar has suffered and will continue to suffer economic and non-economic losses, including lost earnings, lost benefits, impairment to her name and reputation, humiliation, emotional and physical distress, physical injuries and illness, mental anguish, and other non-economic damages.

215.     Under Connecticut common law, the company Defendants' and Brammer's conduct entitle Dunbar to compensatory and punitive damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

a. A declaratory judgment that the Agency Defendants' employment policies, practices, and procedures challenged herein are illegal and in violation of Plaintiff's rights under Title VII;

b. A permanent injunction against the Agency Defendants and their officers, owners, agents, successors, employees, and/or representatives, and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages and discrimination as set forth herein, and order such injunctive relief as will prevent the Agency Defendants from continuing their discriminatory practices and protect others similarly situated;

c. An Order requiring the Agency Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of their past and present unlawful employment policies, practices, and procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

d. An Order requiring the Agency Defendants to initiate and implement systems of compensating and promoting female employees in a non-discriminatory manner;

e. An Order directing the Agency Defendants to engage a reputable independent consultant to audit the effectiveness of the programs described above that would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal pay and equal treatment; (ii) the assurance that injunctive relief is properly

implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described above;

f.   All other appropriate equitable relief to which Plaintiff is entitled;

g.   An award of all back pay and front pay available under law;

h.   An award of all compensatory damages available under law;

i.   An award of punitive damages in an amount to be determined at trial;

j.   An award of all Plaintiff's litigation costs and expenses, including reasonable attorneys' fee available under law;

k.   All pre-judgment and post-judgment interest available under law;

l.   Such other relief as the Court may deem just and proper; and

m.   Retention of jurisdiction by the Court until the Court is satisfied that the Agency Defendants have remedied the practices, policies, and procedures complained of herein in full compliance with the law.

## DEMAND FOR A TRIAL BY JURY

The Plaintiff demands trial by jury of all issues triable of right to a jury.

PLAINTIFF
KAREN DUNBAR

By:   _/s/ *Douglas J. Varga*_
Douglas J. Varga (ct18885)
Scott R. Lucas (ct00517)

LUCAS & VARGA LLC
2425 Post Road, Suite 200
Southport, CT 06890
Tel: (203) 227-8400
Fax: (203) 227-8402
E-Mail: dvarga@lucasvargalaw.com
         slucas@lucasvargalaw.com

Her Attorneys

## <u>CERTIFICATION</u>

I hereby certify that the foregoing Second Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

Dated at Southport, Connecticut this 22nd day of March, 2021.

_____   /s/  *Douglas J. Varga*   _____
Douglas J. Varga (ct 18885)
